REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 678

September Term, 2012

DAVID S. BONTEMPO

v.

CLARK J. LARE, ET AL.

Eyler, Deborah S.,
Wright,
Nazarian,

JJ.[1]

Opinion by Nazarian, J.

Filed: April 30, 2014

[1]Judge Timothy E. Meredith and Judge
Kevin F. Arthur did not participate in the
Court's decision to report this opinion
pursuant to Md. Rule 8-605.1.

# Table of Contents

I. BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
   A. A Promising Start . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
   B. Growing Revenue And Growing Perks . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
   C. The Relationship Sours And Unravels . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
   D. The Aftermath . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
   E. The Litigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
      1. Pleadings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
      2. The Trial Court's Initial Findings . . . . . . . . . . . . . . . . . . . . . . . . . 14
         a. Count I . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
         b. Count II . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
         c. Counts III and IV . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
         d. Count V . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
      3. The Trial Court's Subsequent Findings Pursuant To The Parties' Post-Trial Motions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
         a. The Motions To Alter Or Amend The Judgment . . . . . . . . 19
         b. The May 8, 2012 Post-Trial Order . . . . . . . . . . . . . . . . . . 21
         c. The May 22, 2012 Supplemental Memorandum Opinion . . . 23
      4. The Final Tally . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
II. DISCUSSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
   A. Rights, Duties, And Litigation In Closely Held Corporations . . . . . . . . . . 27
   B. The Circuit Court Did Not Abuse Its Discretion In Crafting Alternative Equitable Relief For Count I, The Dissolution Claim . . . . . . . . . . . . . . . . 30
      1. The Shareholders' Agreement Defines The Parties' Rights And The Range Of Appropriate Remedies . . . . . . . . . . . . . . . . . . . . . . . . . 30
      2. The Circuit Court Did Not Err In Granting Summary Judgment For The Lares In Their Personal Capacity . . . . . . . . . . . . . . . . . . . . . . . 42
   C. The Damages Awarded Under Count III Did Not Make Quotient Whole . 44
      1. The Lares Breached Duties, But Did Not Remedy The Breach . . . . 45
      2. The Circuit Court Did Not Err In Declining To Find Fraud Or Impose Punitive Damages . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49
      3. On Remand, The Circuit Court Must Reconsider The Attorneys' Fees Award . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52
   D. Count V: Mr. Bontempo's Equal Compensation Claim . . . . . . . . . . . . . . 55

Like marriages, business relationships sometimes fail, and the process of disentanglement can be messy and painful. The relationship in this case revolves around an information technology company called Quotient, Inc. ("Quotient") that was owned by long-time business associates Clark Lare (and his wife, Jodi) and David Bontempo. Like a new romantic relationship, the business flourished in its early stages. Like some marriages, the relationship between Mr. Lare and Mr. Bontempo eventually became strained, then unraveled. And not unlike those marriages that end up in the courts, the parties could not agree on how to distribute their respective assets and manage the company going forward after Quotient terminated Mr. Bontempo's employment in 2008, and Mr. Bontempo brought suit, both individually and on behalf of Quotient, in the Circuit Court for Howard County.

For the reasons we explain below, we affirm the circuit court's core liability findings in Mr. Bontempo's favor, and we disagree with Mr. Bontempo's contention that the court abused its discretion in declining to dissolve and dismember Quotient. We hold as well, however, that the circuit court erred in the way it allocated liability for monetary damages and attorneys' fees arising from Mr. Bontempo's derivative claims. And because, similar to divorce cases, the damage and attorneys' fees awards are inextricably intertwined, we vacate the awards for damages and attorneys' fees and costs relating to Count III and remand for further proceedings not inconsistent with this opinion.[1]

---

[1] Before oral argument, Mr. Bontempo filed a motion asking us to take judicial notice of the filing and pendency of *Bontempo v. Lare*, Case No. C-13-095440, another lawsuit he filed against the Lares in the Circuit Court for Howard County. We took the motion under advisement and were prepared to exercise our discretion, *see Simms v. State*, 409 Md. 722,

(continued...)

## I. BACKGROUND

### A. A Promising Start

Mr. and Ms. Lare formed Quotient in 1999. At first, they operated the business out of their home and financed it with personal savings and cash advances on their credit cards. Under their initial shareholder agreement, which they executed in November 2000, Mr. Lare held forty-nine percent of the stock and Ms. Lare owned the rest. At first, Mr. Lare traveled to solicit clients for their fledgling company while Ms. Lare continued to support the couple as a pharmacist and part-owner of Watermont Pharmacy ("Watermont").

Early on, Mr. Lare successfully converted a referral from his former co-worker, David Bontempo, into a contract to provide informational technology services to the United States Census Bureau.[2] Soon after, Mr. Lare hired Mr. Bontempo to work for Quotient and made him a minority shareholder. The parties executed an amendment to the shareholder

---

[1](...continued)
730 n.8 (2009) ("An appellate court's decision to take judicial notice of certain adjudicative facts is discretionary.") (citing *Dashiell v. Meeks*, 396 Md. 149, 176 (2006)); *see also* Md. Rule 5-201(c), to grant the motion for the limited (and probably unavailing) purpose of noting the *fact* of the new complaint. Beyond that, the allegations themselves qualify neither as facts that are commonly known nor facts not subject to reasonable dispute, and thus would not properly be the subject of judicial notice. *See* Md. Rule 5-201(b); *Dashiell*, 396 Md. at 174-75; *Abrishamian v. Washington Med. Grp., P.C.*, ___ Md. App. ___, ___, No. 49, Sept. Term 2013, slip op. at __ (Mar. 4, 2014). In the time since oral argument, however, the parties have advised us that Mr. Bontempo dismissed the new complaint without prejudice, so the motion is more properly denied as moot.

[2] Mr. Lare and Mr. Bontempo worked together from 1992 through 1998 at a company called Maxim Health Care Services ("Maxim"). Each of them left Maxim that year, Mr. Bontempo to join AETEA Information Technology, Inc., and Mr. Lare to start Quotient.

2

agreement (the "Shareholder Agreement") that gave Mr. Bontempo forty-five percent of

Quotient, Mr. Lare four percent, and Ms. Lare fifty-one percent. In exchange, Mr. Bontempo

executed a promissory note in the amount of $46,800. Although Mr. Lare testified that he

expected the note to be repaid, Mr. Bontempo claimed that it existed only for accounting

purposes:[3]

> [COUNSEL FOR THE LARES:] Now, do you remember that at one point in time though, you did execute a promissory note to pay for that stock?
>
> [MR. BONTEMPO:] I do.
>
> *   *   *
>
> [COUNSEL FOR THE LARES:] [Exhibit 7] is a non-negotiable promissory note dated effective March 21, 2001, for forty-six thousand eight hundred dollars, isn't it?
>
> [MR. BONTEMPO:] Yes.
>
> *   *   *
>
> [COUNSEL FOR THE LARES:] Okay, and ah, that was for the stock that he conveyed to you, isn't it? Wasn't that the purpose?
>
> *   *   *
>
> [MR. BONTEMPO:] Um, the purpose of this more was for an accounting record, that there was some value transferred to me, and that there was—Clark and I had an agreement, there was no money to be exchanged for this agreement.

---

[3] Mr. Bontempo never paid on the note, but the Lares paid approximately $12,000 in taxes on the income from it.

The parties never signed a written employment agreement, but they agreed orally that Mr. Bontempo would receive an initial salary of $20,000, and he received his first paycheck in February 2000. The Lares, on the other hand, did not draw a salary until December 2001. Mr. Bontempo contended that he and Mr. Lare reached an additional understanding that once the Lares started to draw a salary, he would draw a salary equal to the *combined* salaries of the Lares:

> [COUNSEL FOR THE LARES:] . . . [I]s there a piece of paper anywhere that you have seen in this case that says that there will be equivalent salaries that I, Dave Bontempo, will receive the same amount in salary as the Lares, or Clark Lare, the Lares in combination, is there any such agreement that you are aware of?
>
> [MR. BONTEMPO:] No, there is not, on paper, written down. But, we did have an oral agreement.

The Lares disputed that such an agreement ever existed:

> [COUNSEL FOR THE LARES:] Ah, did you have discussions during the period of 2000 to 2003 about, ah, whether your salaries should be equal to, or commensurate with Mr. Bontempo?
>
> [MR. LARE:] No, no.

From April 2004 through August 2008, Mr. Bontempo's salary was comparable, and sometimes equal, to the salary received by the Lares. At all other times, however, their salaries differed significantly.

4

Mr. Lare's and Mr. Bontempo's respective responsibilities for running Quotient also evolved over time.[4] At first, they both focused on soliciting clients and building new business. Later on, Mr. Lare focused more on management and operations, while Mr. Bontempo pursued new business and built and maintained client relationships. Later, on March 20, 2004, the three shareholders entered an Amended and Restated Stockholders' Agreement (the "ARSA"). The ARSA restated (and did not alter) the parties' stock ownership and set forth the events that would trigger a compulsory stock sale to the other shareholders, including "[t]ermination of a Shareholder's employment . . . for good cause."

## B. Growing Revenue And Growing Perks

Quotient ultimately qualified for a General Services Administration ("GSA") schedule, which meant that the company could submit bids as a prime contractor for federal government contracts, and it quickly secured contracts with a number of large public and private organizations.[5] With revenue growing, Quotient moved into office space in Columbia, Maryland in 2001, and has moved several times since to accommodate its continued growth.

---

[4] Although Ms. Lare was Quotient's majority shareholder, she had little to no role in Quotient's business. When the circuit court used the term "Lare" in the singular, it referred to Mr. Lare.

[5] Quotient's clients included the United States Census Bureau, Lockheed Martin Corporation, the Internal Revenue Service, the United States Patent and Trademark Office, the Maryland Department of Education, the Smithsonian Institution, the National Library of Medicine and the Clinical Center (each a division of the National Institutes of Health), AARP, the United States Department of Homeland Security, the University of Maryland Medical Systems, and TAJ Technologies, Inc.

In addition to the salaries Quotient paid to Messrs. Lare and Bontempo, the company covered cell phone expenses for both the Bontempos and the Lares. Quotient purchased automobiles for Mr. Bontempo's wife and for Ms. Lare. The Bontempos were issued company credit cards that they used for gas, meals, and entertainment. And Quotient paid for Mr. Lare and other Quotient employees to train with a corporate fitness training company, and for the Lares' personal trainers.

In 2006, the Lares also began paying household employees from Quotient's payroll account,[6] using Quotient funds for personal legal fees, and advancing interest-free loans to Watermont and Broadway Equities, LLC ("Broadway"), a company Mr. Lare formed with his brother to own a beach house in New Jersey. In December 2007, Mr. Lare borrowed $205,586 from Quotient to fund renovations to the Lares' home. This loan originally was to be repaid by March 1, 2009, but on February 1, 2009, Mr. Lare executed a new note in the amount of $497,267.00, with the balance due on January 1, 2016.[7] The Lares eventually agreed that many of these expenses should have been treated as additional income, and they filed amended tax returns both for themselves and Quotient for tax years 2006 through 2009.

---

[6] The Lares listed these household employees as employees of Quotient, and Quotient paid their wages and medical insurance, along with approximately $15,000 in payroll taxes associated with those expenditures. The household employees were not listed on Quotient's financial statements, though, and were not reported to the IRS.

[7] Despite the fact that Mr. Lare, Mr. Bontempo, and Quotient's Chief Financial Officer, Fred Landy, reviewed the company's financial statements each month, and despite the availability of the company's records, Mr. Bontempo testified that he was unaware of the Lares' expenditures and that he did not consent to them.

## C. The Relationship Sours And Unravels

The once-fruitful partnership between Mr. Lare and Mr. Bontempo eventually began to spoil. Mr. Lare's personal use of Quotient funds fueled a growing friction between him and Mr. Bontempo, and their mutual animosity became apparent to other employees. Mr. Bontempo blamed the discord on a series of unilateral decisions Mr. Lare made regarding distributions and salaries:

> Bontempo alleges that, in 2007, Lare took a $100,000.00 distribution and asked Bontempo to wait until the end of the year to take his distribution, but then [Lare's] distribution was converted to a loan which obviated the need to make a similar distribution to Bontempo. According to Bontempo, this also happened in 2008. Another source of conflict was the disparity in Bontempo and Lare's salaries in 2008. Bontempo's salary increased to $244,791.73 that year, and Lare's increased to $323,958.46. Bontempo believed that the difference in salary was supposed to be made up to him, but it never was. Bontempo alleges that in 2009, Lare took a distribution without telling Bontempo, and that Bontempo never received his proportionate distribution.

Mr. Lare, on the other hand, attributed the strained relationship to his view that Mr. Bontempo's job performance had lagged:

> Lare began to doubt Bontempo's commitment to Quotient in 2007, when Lare's own workload increased. Lare felt that as Quotient grew, more and more work fell on his shoulders and he needed more support from Bontempo, but was not receiving it. He felt that Bontempo was pursuing outside interests, such as his interest in jazz music and other commercial ventures with his brother, to the detriment of Quotient.

7

To "light a fire under" Mr. Bontempo, Mr. Lare lowered his salary by ten percent in June 2009.[8] This was not well received.

Another source of tension arose in September 2009, when Mr. Lare rejected Mr. Bontempo's suggestion that Quotient hire John O'Leary, a technology professional with whom Mr. Bontempo was familiar. Mr. Lare contended that Quotient did not have the funds to hire an additional business development employee, although it turns out that he was simultaneously directing Quotient to advance funds to Watermont and Broadway. Mr. Bontempo disagreed with this decision even before learning about Mr. Lare's investment of Quotient funds into the other companies, and the tension grew.

The two men aired their grievances in November 2009. Mr. Lare expressed his concerns about Mr. Bontempo's performance and Mr. Bontempo raised his concerns about Mr. Lare's financial decisions (although he felt that his concerns were "brushed off"). They met again in January 2010 to discuss salaries and distributions. According to Mr. Bontempo, after he asked Mr. Lare about his 2009 distribution, Mr. Lare responded that "[t]here is no distribution." In response, Mr. Bontempo told Mr. Lare that they needed to work out an exit strategy, and proposed that they split the company. Mr. Lare refused, and instead told Mr. Bontempo to sell back his stock: "You need to sell your stock, Dave. You need to sell it. We need to come up with a price. You need to name a price, and sell it." Mr. Bontempo refused.

---

[8] According to Mr. Lare, he also secretly lowered his own salary by ten percent.

Shortly thereafter, Mr. Lare presented Mr. Bontempo with a proposal for Mr. Bontempo's departure from Quotient. Mr. Bontempo again refused.

Mr. Lare and Mr. Bontempo held another meeting on March 26, 2010. Mr. Lare handed Mr. Bontempo a separation agreement that Mr. Bontempo refused to sign, then informed Mr. Bontempo that his employment was being terminated. Neither Mr. Bontempo nor Quotient's employees were informed that Mr. Bontempo was terminated "for cause," but at trial, Quotient contended, through the testimony of Mr. Lare, that Mr. Bontempo's firing resulted from his poor job performance.

## D.     The Aftermath

After termination, Mr. Bontempo remained an officer and director of Quotient. On March 29, 2010, while still in those roles, Mr. Bontempo revoked his personal guarantee of Quotient's credit facility with Branch Banking & Trust ("BB&T"). He claimed that he did this to limit the risk that he and his family would face if Quotient failed and because he thought that Mr. Lare "would just flat-out take [his] distributions." Shortly thereafter, BB&T notified Quotient that its loan was in default as a result of multiple violations of the terms of the loan documents, including Mr. Bontempo's revocation, the filing of this lawsuit, and Quotient's loans to Watermont. Quotient had difficulty obtaining alternative financing, but ultimately entered a new credit facility with Wells Fargo Business Credit on less favorable terms than the original agreement with BB&T; the difference cost the company $85,000 in additional finance charges.

On August 23, 2010, six months after his termination, Mr. Bontempo voluntarily resigned as an officer and director of Quotient. However, he remained (and remains to this day, so far as the record reflects) a shareholder, and he continued to receive distributions totaling $466,044 in 2009, $252,665 in 2010, and $465,000 in 2011.

After his resignation as an officer and director, Mr. and Mrs. Bontempo started a new business, Siloquent LLC. Although Mr. Bontempo met with contacts he developed through Quotient and informed them that he was starting a new business, he claimed that he had no intention of soliciting business during those meetings. Because Siloquent did not have a GSA schedule, it struggled to compete with Quotient.

## E.    The Litigation

### 1.    Pleadings

On April 2, 2010, Mr. Bontempo filed his initial complaint against Quotient and the Lares in the Circuit Court for Howard County, which sought relief pursuant to Maryland's corporate dissolution statute, Md. Code (1975, 2007 Repl. Vol), Section 3-413(b)(2) of the Corporations and Associations Article ("CA").[9] On August 12, 2010, he amended the complaint to add counts of constructive trust, breach of fiduciary duty, and constructive fraud, and Quotient filed a counterclaim requesting a declaration that Mr. Bontempo was

---

[9] Under CA § 3-413(b)(2), "[a]ny stockholder entitled to vote in the election of directors of a corporation may petition a court of equity to dissolve the corporation on the grounds that . . . [t]he acts of the directors or those in control of the corporation are illegal, oppressive, or fraudulent." CA § 3-413(b)(2).

10

fired for cause, an order that he was accordingly required to sell his stock, and a finding that he breached fiduciary duties he owed to Quotient.[10] Mr. Bontempo amended his complaint again on December 21, 2010, and the trial court's overview of this second amended complaint (which remains the operative complaint and to which we will refer from here on as the "Complaint") provides a helpful framework for the disputes before us:

> Count I of [the Complaint] seeks relief pursuant to [CA §] 3-413 . . . . Bontempo requests the following relief:
>
> 1)    Prompt appointment of a receiver or trustee to take charge of the assets and operate the business of the corporation, as necessary and proper to preserve Quotient's assets, pending a final determination as to potential judicial dissolution of Quotient;
>
> 2)    An Order reinstating Bontempo as an employee of Quotient and appointing him as an officer of the Court to assist in preservation of Quotient's assets and customer relationships;
>
> 3)    An Order requiring dissolution of Quotient at a specified future date, to become effective in the event that the stockholders fail to resolve their differences;
>
> 4)    An Order requiring the Lares to promptly and fully account to Quotient and Bontempo for any and all uses or transfers of Quotient assets to the Lares for their direct or indirect personal benefit;
>
> 5)    An Injunction to prohibit continuing acts of oppressive conduct and to cease or reduce salary and distribution payments to the Lares;

---

[10] Each count of the Counterclaim was denied and Quotient did not appeal any of the court's rulings.

11

6) An Order dividing Quotient's assets, including customer accounts, and awarding Bontempo 45% of Quotient's assets to manage independently of the Lares;

7) Damages to Bontempo as compensation for the Lares' illegal, oppressive, and fraudulent conduct;

8) Attorney's fees, including expert's fees, interest, and costs; and

9) Further relief as may be just and appropriate.

In Count II of the [Complaint], Bontempo alleges Constructive Trust against the Lares on behalf of Quotient. First, Bontempo requests that a constructive trust be established for any and all monies or property obtained for the benefit of the Lares outside of the auspices of Quotient, that the Lares convey to Quotient any such monies or property, and that Bontempo be awarded expenses for prosecuting this complaint on behalf of Quotient.

In Counts III and IV of the [Complaint], Bontempo alleges Breach of Fiduciary Duty and Constructive Fraud against the Lares on behalf of Quotient. Bontempo requests the same relief for both Counts—that the Lares be directed to pay compensatory damages to Quotient, punitive damages, and Bontempo's expenses for prosecuting the complaint on behalf of Quotient.

Bontempo alleges Breach of Contract in Count V, based on the alleged agreement that his salary would be equivalent to the combined salaries of the Lares and an alleged failure to receive his proportionate share of stockholder distributions. Bontempo seeks compensatory damages in the among of $528,000.00 for unpaid salary and $118,000.00 for distributions, as well as punitive damages and attorney's fees.

Before trial, each party filed a motion for partial summary judgment and the court held a motions hearing on March 3, 2011. *First*, Mr. Bontempo sought summary judgment on the portion of Quotient's counterclaim arguing that Mr. Bontempo breached his fiduciary duties

12

to Quotient by filing this lawsuit in bad faith and by revoking his personal guarantee of Quotient's line of credit with BB&T. The court denied this motion, finding that facts on the issue remained subject to dispute and that Mr. Bontempo was not entitled to judgment as a matter of law. *Second*, Quotient sought summary judgment on two remedies sought by Mr. Bontempo—his reinstatement as an officer and director of Quotient and dissolution of Quotient. The court denied this motion as well, declining, at that point, to find these remedies unavailable. *Finally*, the Lares sought summary judgment on Mr. Bontempo's request for employment-based remedies against them personally under CA § 3-413. The court granted this motion, finding employment-based damages *from a shareholder* impermissible under CA § 3-413 without a clear allegation of fraud on the part of that shareholder.

A nine-day bench trial[11] was held between March 14 and March 31, 2011, during which the parties presented 146 exhibits and the court heard testimony from eighteen witnesses. After trial, the court issued a Memorandum Opinion and Order on September 29, 2011. After timely post-trial motions and further hearings, the court issued three follow-up orders—a Post-Trial Memorandum and Order dated May 8, 2012, a Supplemental Memorandum and Order dated May 22, 2012, and a Clarification Order dated June 13, 2012—that made additional findings and altered some of its original decisions.

---

[11] Mr. Bontempo initially demanded a jury trial, but the Lares moved the court to strike his demand. On February 7, 2011, the parties ultimately entered a stipulation under which they agreed that all claims and counterclaims would be tried by the bench.

## 2. The Trial Court's Initial Findings

In the circuit court's initial order, dated September 29, 2011, the court found in favor of Mr. Bontempo and against Quotient on Count I; in favor of Quotient and against Mr. Bontempo on Count II; in favor of Quotient and against the Lares on Count III; in favor of the Lares and against Quotient on Count IV; and in favor of Mr. Bontempo and against Quotient on Count V.

### a. Count I

Under Count I, Mr. Bontempo requested equitable relief, including the dissolution of Quotient, pursuant to CA § 3-413(b)(2), based on the Lares' "illegal, oppressive, and fraudulent" conduct. The court applied *Edenbaum v. Schwarcz-Osztreicherne*, 165 Md. App. 233 (2005), in which we held that a plaintiff alleging oppressive conduct was required to prove that those in control of the corporation oppressed "the reasonable expectations of the minority shareholder":

> [A] minority shareholder who reasonably expects that ownership in the corporation would entitle him to a job, a share of the corporate earnings, and a place in corporate management would be "oppressed" . . . when the majority seeks to defeat those expectations and there exists no effective means of salvaging the investment.

*Id.* at 258 (quoting *Balvik v. Sylvester*, 411 N.W.2d 383, 387 (N.D. 1987)).

14

The court found that Mr. Lare's conduct, particularly his threat to fire Mr. Bontempo if he did not voluntarily resign and sell his shares, met the standard for oppressive conduct.[12] It reasoned that Mr. Lare attempted to defeat Mr. Bontempo's "reasonable expectations . . . that [Quotient] would employ him, that he would participate (as a stockholder) in the company's profit distributions and that he would not be terminated for subjective reasons," and that Mr. Bontempo's reasonable expectations arose from the "sweat equity" he contributed to Quotient.

In finding Mr. Bontempo's expectations—specifically, his expectations to be an owner, to be employed, and to have a role in Quotient—to be objectively reasonable, the trial court recognized that it had "an array of remedies available to it under *Edenbaum*, including 'alternative equitable remedies not specifically stated in the statute.' [*Edenbaum*, 165 Md. App.] at 260." At the same time, the court specifically declined to dissolve Quotient:

> One of the remedies requested by Bontempo is dissolution of Quotient after a specified period of time if the parties are unable to resolve their differences. . . . *The [court] is of the opinion that this remedy would be inappropriate and that less drastic measures are available as remedies to address the harm caused by the oppressive conduct.*

---

[12] Although Mr. Lare contended that he terminated Mr. Bontempo for poor job performance, the testimony of current and former employees of Quotient weighed against this contention. The court found that Mr. Lare's testimony regarding termination was not credible and that his assertions regarding Mr. Bontempo's poor job performance "strain[ed] credulity."

15

(Emphasis added.) Instead, the court ordered relief designed to assess the extent of the financial harm caused by the Lares' "oppressive conduct" and to make Mr. Bontempo whole for redressing it:[13]

1. The ordering of a full and complete accounting by the Lares . . . for misappropriated funds, *i.e.*, all funds advanced or expenses paid that were for their direct or indirect benefit and not related to Quotient's legitimate business purpose.

2. Reimbursement of the legal fees and expenses incurred by Bontempo in the total amount of $211,267.34 . . . .

3. Reimbursement of the expert witness fees and expenses . . . incurred by Bontempo in the total amount of $81,455.50.

### b.    Count II

In Count II, Mr. Bontempo brought a derivative claim on behalf of Quotient, requesting that the court establish a constructive trust[14] and order the Lares to return all assets transferred to them from Quotient for their benefit and for the benefit of Broadway and Watermont. Mr. Bontempo sought to collect the fees and expenses he incurred in prosecuting this claim on Quotient's behalf. The trial court's order found in favor of Quotient but against Mr. Bontempo on this count and declined to order a constructive trust

---

[13] The trial court declined to award punitive damages because it did not find the Lares' conduct to be fraudulent.

[14] The trial court defined a constructive trust as "the remedy employed by a court of equity to convert the holder of the legal title to property into a trustee for one whom in good conscience should reap the benefits of the possession of said property."

16

because it had awarded damages to Mr. Bontempo and ordered an accounting in connection with Count I.

### c. Counts III and IV

In Count III, Mr. Bontempo, again on behalf of Quotient, alleged that Mr. Lare breached his fiduciary duties to Quotient by giving interest-free loans to Broadway and Watermont in violation of its covenant with BB&T, by giving himself a significant stockholder loan, by including his household employees in Quotient's healthcare plan, and by giving himself a $26,000 advance after Quotient had defaulted under the BB&T financing agreement. The court cited *Storetrax.com, Inc. v. Gurland*, 397 Md. 37 (2007), which held that directors of a corporation "'[o]ccupy a fiduciary relation to the corporation and its stockholders,'" *id.* at 53 (quoting *Booth v. Robinson*, 55 Md. 419, 436 (1881)), and "'are entrusted with powers which are to be exercised for the common and general interest of the corporation, *and not for their own private individual benefit*.'" *Id.* at 54 (emphasis added) (quoting *Booth*, 55 Md. App. at 436-37). The court found that Mr. Lare's personal use of corporate funds was contrary to the best interests of Quotient, contrary to Quotient's financial health, and constituted a breach of his fiduciary duty to Quotient. The court entered judgment in favor of Quotient and against the Lares, then found that "the damages for this breach are those previously awarded as a remedy to Lare's oppressive conduct," *i.e.*, for Count I.

In Count IV, Mr. Bontempo sought damages on behalf of Quotient for constructive fraud, which the court defined as "a breach of legal or equitable duty that, irrespective of the moral guilt of the fraud feasor, the law declares fraudulent because of its tendency to deceive others, to violate public or private confidence, or to injure public interests," and recognized that "[n]either actual dishonesty of purpose nor intent to deceive is an essential element of constructive fraud." *See Scheve v. McPherson*, 44 Md. App. 398, 406 (1979). Although the court found Mr. Lare to have exercised poor judgment and to have mismanaged corporate assets, it found that Mr. Bontempo had not proven that Mr. Lare's conduct was fraudulent, and it entered judgment for the Lares and against Quotient.

#### d.    Count V

Mr. Bontempo alleged two breaches of contract. *First*, he alleged that he and Mr. Lare had reached an oral agreement that his salary would be equivalent to the Lares' combined salaries, and that his actual salary was lower by $528,000. *Second*, he alleged that he received $118,000 less than his proportionate share of shareholder distributions. Although Mr. Bontempo presented evidence that his salary equaled that of the Lares from 2004 through 2008, the court recognized that their salaries varied significantly during the early and later years of Mr. Bontempo's tenure with Quotient, and without written documentation to reflect the agreement or other evidence of a meeting of the minds, the court found that Mr. Bontempo failed to meet his burden of proving the existence of the salary equalization agreement. The court did find, however, that Mr. Bontempo was entitled to the $118,000 for

unpaid distributions, and entered judgment on this portion of Count V against Quotient. The court also ordered that Quotient pay attorneys' fees on this count, but denied punitive damages.

To sum up, then, the circuit court awarded the following to Mr. Bontempo and/or against Quotient in its initial post-trial order:

1. A full and complete accounting by the Lares (the majority in control of the corporation) for misappropriated funds, *i.e.*, all funds advanced or expenses paid that were for their direct or indirect benefit and not related to Quotient's legitimate business purposes. (Count I—Judgment against Quotient; Count III—Judgment against the Lares)

[2.] Reimbursement of the legal fees and expenses incurred by Bontempo in the total amount of $211,267.34 (Count I—Judgment against Quotient; Count III—Judgment against the Lares)

[3.] Reimbursement of the expert witness fees and expenses billed for Robert A. Garvey incurred by Bontempo in the total amount of $81,455.50. (Count I—Judgment against Quotient; Count III—Judgment against the Lares)

[4.] Judgment in the amount of $118,000 in favor of Bontempo and against Quotient. (Count V)

### 3. The Trial Court's Subsequent Findings Pursuant To The Parties' Post-Trial Motions

#### a. The Motions To Alter Or Amend The Judgment

In response to the trial court's order, Mr. Bontempo filed a Motion to Alter or Amend the Judgment, in which he argued that the court failed to grant relief that vindicated his

reasonable expectations pursuant to *Edenbaum*. Mr. Bontempo asked the court to revise its

order and grant additional relief that the trial court later summarized as follows:

[1.] Appoint an Agent to supervise, and to report to the Court, concerning a Court-ordered allocation of Quotient's accounts and other assets on a 55/45 basis, with the Court retaining equitable jurisdiction to grant further relief at a later date or, alternatively direct the Lares to sell their stock to Bontempo under the provisions of the [ARSA] . . . .

[2.] Establish accounting procedures.

[3.] Allocate certain [Quotient] contracts to Bontempo as a subcontractor to Quotient.

[4.] Award Bontempo the salary he has not received since March 2010, in an amount equal to the combined salaries of [the Lares].

[5.] Award Bontempo additional attorneys' fees and litigation expenses.

[6.] Make a finding of fraud and award Bontempo punitive damages.

[7.] Require Jodi Lare (majority shareholder) to terminate Clark Lare (minority shareholder) for cause.

[8.] Impose personal liability on [the Lares] for the damages the Court awarded to Bontempo under Count I of the [Complaint].

[9.] Imposition of a constructive trust.

[10.] Make a finding of constructive fraud.

[11.] Award other various forms of short-term relief.

20

The Lares and Quotient also filed together a Motion to Alter or Amend seeking a clarification of the order for an accounting, modification of the judgment to avoid double-counting, and elimination of the award of litigation costs. The court held a hearing on the post-trial motions on January 4, 2012.

### b.    The May 8, 2012 Post-Trial Order

The trial court issued a Memorandum Opinion and Order addressing the parties' post-trial motions on May 8, 2012. The court declined to grant the additional relief Mr. Bontempo sought, but granted a portion of the relief sought by Quotient and the Lares. In denying Mr. Bontempo's motion, the court reiterated its decision not to remedy the Lares' misconduct by micromanaging the internal affairs of a prospering company:

   a.    The court found the compensation as proportionate to the services rendered;

   b.    The court declined to order dissolution because the remedies it had imposed addressed the oppressive conduct Mr. Bontempo had proven;

   c.    The court would not reallocate Quotient's contracts to Mr. Bontempo because doing so would go far beyond his reasonable expectations for joining the company;

   d.    The court found no legal basis to award Mr. Bontempo, an at-will employee, employment-based damages such as back pay for a statutory oppression claim;

   e.    The court found that any expectation of lifetime employment was unreasonable. Although the court emphasized that Mr. Bontempo had a subjective expectation of employment without termination and participation as a stockholder in the company's

21

distributions, the court found that he knew he was a minority shareholder and an at-will employee;

f.  The court declined to direct that the majority shareholders sell their stock to Mr. Bontempo because it found no fraudulent conduct on the part of the Lares; and

g.  The court declined to order Ms. Lare to sell her shares of Quotient because it had found oppressive conduct only on the part of Mr. Lare.

In response to the Quotient/Lare motion, the court clarified its order directing an accounting of "misappropriated funds" under Count I. And in lieu of the damages it had ordered the Lares to pay to Mr. Bontempo under Count III, the court directed that the accounted-for amount should be characterized as a distribution to the Lares and that Mr. Bontempo should receive a proportionate distribution under Count I.[15] The court also amended the previous equitable disbursement it had ordered under Count V and revised the unpaid distributions to $81,818.18. Finally, the court vacated the attorneys' fee, expert witness fee, and litigation expense awards because it had not held a hearing before awarding them.

---

[15] The trial court amended the relief granted under Count III as follows:

> A full and complete accounting by the Lares (the majority in control of the corporation) for misappropriated funds, *i.e.*, all funds advanced or expenses paid by Quotient for the Lares' household employees or personal litigation expenses; judgment is entered for Bontempo and against Quotient on Count I in a proportionate share of the accounted-for amount. The accounting shall be completed no later than August 15, 2012.

22

### c. The May 22, 2012 Supplemental Memorandum Opinion

The trial court revisited the fee awards in a Supplemental Memorandum Opinion, which it issued on May 22, 2012, after holding another hearing. Mr. Bontempo had requested a fee award totaling $426,741.18 for winning on Counts I and III, and the court declined his request. The court declined to award fees under Count I because that count was not a derivative claim, and the court found no exception to the "American rule"[16] that would support fee-shifting to Quotient on that count. The court did find that Mr. Bontempo was entitled to attorneys' fees under Count III, the derivative claim, and that Quotient was responsible for these costs pursuant to the "common fund doctrine":

> "If a derivative action is successful, in whole or in part, or if anything is received by the plaintiff as a result of a judgment, compromise, or settlement of an action or claim, the court may award the plaintiff reasonable expenses, including reasonable attorney's fees, and shall direct him to remit to the [close corporation] the remainder of those proceeds received by him."

*Garcia v. Foulger Pratt Dev., Inc.*, 155 Md. App. 634, 664 (2003) (quoting CA § 10-1004). The court examined the fees and expenses sought by Mr. Bontempo, removed charges unrelated to the successful claims, reduced the total *pro rata* to reflect a 16.2% average success rate in the litigation, and entered a fee and expense award totaling $109,012.76.[17]

---

[16] The trial court recognized that under the "American rule," "absent a statute or contractual provision to the contrary, each party should bear his/her/its own attorney's fees."

[17] Based on a calculation error, the trial judge initially awarded attorneys' fees and costs in the amount of $71,619.65.

### 4.    The Final Tally

When the post-trial dust settled, Mr. Bontempo prevailed (either personally or on behalf of Quotient) on Counts I, III, and V:

- Under Count I, the court ordered Quotient to pay Mr. Bontempo $167,638;[18]

- Under Count III, the court ordered Quotient to treat the misappropriated funds (the same damages calculated by the accounting in Count I) as a distribution from Quotient to the Lares, from which Quotient would pay a proportionate distribution to Mr. Bontempo, and ordered Quotient to pay Mr. Bontempo attorneys' fees totaling $109,012.76; and

- Under Count V, the court directed Quotient to pay Mr. Bontempo $81,818.18 in unpaid distributions.

Mr. Bontempo filed a timely notice of appeal, and Quotient filed a timely cross-appeal.

## II.  DISCUSSION

Overall, nobody is wholly pleased with the decisions below, which in a complicated and heated case like this is usually a sign that the circuit court was on to something. Mr. Bontempo believes that he won the case below, but that the package of remedies the circuit court awarded does not reflect the full scope of the victory he won or the harms he and

---

[18] The accounting was completed while post-trial motions were pending and was accepted by the court on September 18, 2012.

24

Quotient suffered. He raises the following questions for our review (which we have reworked for clarity):

I.      Whether the circuit court erred by declining to award all of the relief sought by Mr. Bontempo under Count I, despite having found that the Lares violated Mr. Bontempo's reasonable expectations as a minority shareholder.

II.      Whether the circuit court erred by declining to award Mr. Bontempo any damages from the Lares, personally, under Count I as a result of their oppressive conduct.

III.      Whether the circuit court erred in finding the Lares not liable to Quotient for constructive fraud in connection with Count IV.

IV.      Whether the circuit court erred in finding that the Lares' conduct was not "fraudulent" for purposes of justifying the imposition of punitive damages under Count IV.

V.      Whether the circuit court erred in finding that Mr. Bontempo had failed to carry his burden of proof on his equal compensation claims under Count V.

For its part, Quotient doesn't challenge the circuit court's findings regarding Mr. Lare's oppressive conduct or the core remedies the circuit court imposed, but does contest the court's decision to award litigation fees and expenses to Mr. Bontempo under Count III. Quotient also raises an additional question bearing on the respective responsibility of the different parties (which we have renumbered to make it consecutive):[19]

---

[19] The appellees' other two questions restate questions presented by Mr. Bontempo.

VI.    Whether the trial court erred by requiring a corporation to pay a derivative plaintiff's litigation costs from its own funds where there was no recovery of funds for the corporation.

We affirm the overwhelming bulk of the circuit court's decisions. There was ample evidence to support the circuit court's findings that the Lares wrongfully blurred, and even ignored, the boundaries that Maryland corporate law draws between Quotient and the Lares' personal affairs, and that they did so to the detriment of Quotient and Mr. Bontempo. But as straightforward as the foregoing sentence may seem, it is a good bit harder to translate that general conclusion into specific findings of liability and remedies, particularly since, much as they did in real life, the Lares continue to characterize their rights and interests in this litigation as fully aligned with Quotient's. And they aren't, as we will see when we parse through the actual claims and findings, most notably in connection with the derivative claims Mr. Bontempo brought on behalf of Quotient to redress the Lares' overstepping. At the same time, the record amply supports the circuit court's conclusion that Mr. Bontempo overstated his direct injuries, and the court quite reasonably declined his invitation to remedy the Lares' injuries to Quotient by dissolving the company and handing its customers over to him. The circuit court erred not through any errors of judgment or abuses of discretion regarding the nature or extent of the wrongs or injuries, but only in how it assigned responsibility for the damages among the parties, a tricky task given the confluence of individual and derivative claims the court faced.

As a general matter, we review the circuit court's factual findings for clear error and its legal conclusions *de novo*. *Dynacorp Ltd. v. Aramtel Ltd.*, 208 Md. App. 403, 451 (2012), *cert. denied*, 430 Md. 645 (2013). We "will not set aside the judgment of [a] trial court on the evidence unless clearly erroneous, and will give due regard to the opportunity of the trial court to judge the credibility of the witnesses," Md. Rule 8-131(c), and "'we accord no deference'" to the court's legal conclusions, "'which we review to determine whether they are legally correct.'" *Ramlall v. MobilePro Corp.*, 202 Md. App. 20, 34 (2011) (quoting *Cattail Assocs., Inc. v. Sass*, 170 Md. App. 474, 486 (2006)). We discuss more specific standards and sub-standards of review as they arise.

### A.     Rights, Duties, And Litigation In Closely Held Corporations

This case grows out of a relationship—a business relationship defined by the parties' respective roles as directors, officers, and shareholders of Quotient. As the relationship unraveled and (d)evolved into litigation, the existence of the corporate form and the parties' respective roles in that corporation defined their rights and obligations among each other and vis-à-vis Quotient. Like most corporate divorces, this case involves an array of allegations, claims, and legal theories. Unlike most corporate divorces, Mr. Bontempo pursued not only the usual counts, but also asked the circuit court to dissolve Quotient or impose alternative remedies. Because his various claims are meant to serve different purposes under Maryland corporate law, it is worth pausing briefly to set the analytical stage.

27

Quotient is a Maryland corporation. Mr. Bontempo and the Lares are its shareholders; the Lares hold the majority of the shares. At all times, Mr. and Ms. Lare were officers; at most relevant times, Mr. Bontempo was as well. Corporations are creatures of statute that are owned by their shareholders, and "[t]he directors of a corporation stand in a fiduciary relationship to the corporation and its stockholders." *Mona v. Mona Elec. Grp.*, 176 Md. App. 672, 695 (2007). A director is required to act reasonably and in the *corporation*'s best interests:

> A director shall perform his duties as a director . . . : (1) In good faith; (2) In a manner he reasonably believes to be in the best interests of the corporation; and (3) With the care that an ordinarily prudent person in a like position would use under similar circumstances.

CA § 2-405.1(a). Under the historic "business judgment rule," now codified at CA § 2-405.1(e), directors are *presumed* to act in a manner consistent with these duties, and the party challenging a director's decision(s) bears the burden of rebutting that presumption. *Mona*, 176 Md. App. at 696 (citing *Bender v. Schwartz*, 172 Md. App. 648, 667 (2007)); *see also* James J. Hanks, Jr., *Maryland Corporation Law* §6.8, at 207 (2013 Supp.) ("Hanks").

Maryland corporate law anticipates the possibility that majority shareholders might misuse their authority to the detriment of the minority or the corporation itself or both:

> Maryland common law recognizes that minority shareholders are entitled to protection against fraudulent or illegal action of the majority. Especially in closely held corporations, the majority shareholder owes a fiduciary duty to the minority shareholder (or shareholders) "not to exercise [their] control to the disadvantage of minority shareholders." *Lerner v. Lerner*

28

> *Corp*., 132 Md. App. 32, 53 (2000). A majority shareholder owes a fiduciary duty to minority shareholders not to use his voting power for his own benefit or for a purpose adverse to the interests of the corporation and its stockholders. *Coop. Milk Serv., Inc. v. Hepner*, 198 Md. 104, 114 (1951).

*Mona*, 176 Md. App. at 697.

Accordingly, Maryland law recognizes three categories of options for minority shareholders aggrieved by the actions of the majority, each with a different remedial purpose. *First*, to the extent a minority shareholder suffers an injury personal to him, he can bring a direct action against the corporation, its officers, directors, or other shareholders and recover damages directly. *Id.* ("To maintain a direct action, the shareholder must allege that he has suffered 'an injury that is separate and distinct from any injury suffered either directly by the corporation or derivatively by the stockholder because of the injury to the corporation.'" (quoting Hanks § 6.8, at 183 (2005))). *Second*, and perhaps most commonly, a minority shareholder can bring a derivative action, "'an extraordinary equitable device to enable shareholders to enforce a corporate right that the corporation failed to assert on its own behalf.'" *Id.* at 698 (quoting *Werbowsky v. Collomb*, 362 Md. 581, 599 (2001)). Unlike a direct action, however, "[a]ny recovery in a shareholder's derivative suit is in favor of the *corporation*, not the individual shareholder (or shareholders) who brought the derivative action." *Id.* (emphasis added). And *third*, as we discuss next because Mr. Bontempo started his complaints with such a request, any shareholder (minority or otherwise) can ask a circuit court to dissolve the corporation, CA § 3-413, or to order alternative equitable relief available

29

in Maryland under the dissolution statute since our decision in *Edenbaum*. 165 Md. App. 233. This case features claims falling into the latter two categories although, as we shall see, the boundaries can get blurry.

**B.** **The Circuit Court Did Not Abuse Its Discretion In Crafting Alternative Equitable Relief For Count I, The Dissolution Claim.**

Mr. Bontempo alleged in Count I that the Lares engaged in "oppressive conduct," as that term is used in CA § 3-413(b)(2), and asked the circuit court to order broad equitable relief in response. He prevailed on the merits of this count, but challenges the relief that the circuit court awarded him, which we review for abuse of discretion. "[W]e will not reverse a ruling . . . simply because we would have made a different ruling had we been sitting as trial judges," and we will only vacate a decision if "no reasonable person would take the view adopted by the [trial] court." *Edenbaum*, 165 Md. App. at 254 (quotation marks and citations omitted).

**1.** **The Shareholders' Agreement Defines The Parties' Rights And The Range Of Appropriate Remedies.**

We start, as we must, with the statute. Section 3-413(b)(2) of the Corporations and Associations Article provides that "any *stockholder* entitled to vote in the election of directors of a corporation may petition a court of equity to dissolve the corporation on the grounds that . . . [t]he acts of the directors or those in control of the corporation are illegal, oppressive, or fraudulent." CA § 3-413(b)(2) (emphasis added). The key word is *stockholder*: Mr. Bontempo's standing to seek relief under § 3-413 arises from his status as

30

a shareholder of Quotient. And although *Edenbaum* may not have used these precise words, his status as a shareholder of Quotient (as defined by his shareholder agreement) defines and bounds the rights he is entitled to vindicate in this count and informs the analysis of the appropriate equitable remedies.

*Liability* is not in dispute at this point. Neither Mr. Lare nor Quotient challenges the finding that Mr. Lare committed "oppressive conduct," a concept we defined in *Edenbaum* as turning on the objectively reasonable expectations of the shareholder going into the enterprise: conduct is oppressive if it "'substantially defeats expectations that, objectively viewed were both reasonable under the circumstances and were central to the [minority shareholder's] decision to join the venture.'" *Edenbaum*, 165 Md. App. at 258 (quoting *Matter of Kemp & Beatley, Inc.*, 473 N.E.2d 1173, 1179 (N.Y. 1984)). Mr. Bontempo contended at trial that he "reasonably expected to be employed by Quotient, to share in its earnings per his agreements with the Lares, and to have a place in its day-to-day management." And the circuit court largely agreed as a factual matter:

> Lare's assertions that Bontempo's job performance was poor and that he had "checked out" of the company strains credulity and is totally against the weight of the evidence. By all accounts, Bontempo was a responsible and dedicated employee. Bontempo's commitment to the company (as an employee, director and stockholder) was further evidenced by his willingness to reduce his own salary in order to bring in an employee (O'Leary) who he believed would contribute to Quotient's success. Lare told Bontempo that Quotient could not afford O'Leary's salary during the same time he was directing that Quotient funds be diverted to Watermont and Broadway, two entities in which the Lares had a personal financial interest.

31

There is no support for Lare's position that Bontempo was well aware of—and approved—the multitude of transactions that took place.

Lare's testimony regarding his reasons for terminating Bontempo is not credible. Lare's feeling that he and Bontempo could no longer work together was obvious to other key Quotient employees. The professional incompatibility that developed cannot be attributed to Bontempo's job performance. Bontempo testified that Lare threatened to fire him if he would not voluntarily resign and sell his stock. When Bontempo refused, Lare followed through on his threat. Lare testified that he never told Bontempo that he was being fired for cause under the ARSA. It is significant that there was no indication by Lare to Bontempo that he was being terminated for cause until after the threat of litigation loomed.

The Court finds that Lare's actions were oppressive, particularly as they related to the credible testimony that Bontempo would be fired if he did not voluntarily resign and sell his shares of Quotient stock. Bontempo's reasonable expectations were that this *start-up company would employ him*, that he would participate (as a stockholder) in the company's profit distributions and that *he would not be terminated for subjective reasons*. Bontempo was more than a mere employee of Quotient—he was, in all respects, a founding member of the company and made significant contributions to the company's later successes.

(Emphasis added.) Mr. Lare and Quotient fought these points at trial, but neither challenges the circuit court's conclusions now.

The harder part comes in evaluating the *relief* the circuit court awarded in connection with this count. Mr. Bontempo argues that despite finding oppressive conduct, the circuit court effectively gave him no relief. He argues that the court found that Mr. Lare had no cause to terminate him, but awarded no damages for his lost employment, and limited his

32

recovery only to an accounting and *post hoc* distribution that would have been required anyway. We disagree that the court abused its discretion by fashioning the relief in this manner, but it takes a few steps to explain why.

*Edenbaum*, which bears a strong structural resemblance to this case, frames our analysis. In that case, two owner-operators of an assisted living facility entered into a shareholders' agreement that, among other things, provided that the plaintiff (the minority shareholder) would be employed as its Director of Operations and that each shareholder would receive equal salaries and profits. 165 Md. App. at 239. The defendant (the majority shareholder) became dissatisfied with the plaintiff's performance, offered her two buyout options, and threatened to fire her if she did not agree to one of them. The plaintiff refused, was fired, and sued for breach of contract and for dissolution pursuant to CA § 3-413(b)(2). *Id.* at 241.

We agreed in *Edenbaum* with the trial court that the plaintiff was oppressed because "[h]er termination substantially defeated her reasonable expectations that she would be employed by the corporation, receive a salary, and take part in [the business's] management." *Id.* at 259. But we also found that the trial court did not abuse its discretion in declining to dissolve the corporation. Because dissolution is an irrevocable all-or-nothing remedy, *id.* at 259 ("'[T]he demise of a corporation is regulated as an extraordinary action under Title 3 of the Article.'" (quoting *Renbaum v. Custom Holding, Inc.*, 386 Md. 28, 48-49 (2005))), we expressed a concern shared by courts in other states: allowing minority shareholders to force

33

dissolution too easily risked shifting too much power to them. *Id.* ("Moreover, '[i]n a sense,

a forced dissolution allows minority shareholders to exercise retaliatory oppression against

the majority.'" (quoting *Alaska Plastics, Inc. v. Coppock*, 621 P.2d 270, 274 (Alaska 1980))).

We decided, therefore, to join other states that recognize remedial measures short of

dissolution, and we adopted a list of alternative remedies described in *Baker v. Commercial

Body Builders, Inc.*, 507 P.2d 387, 395-96 (Ore. 1973), for the circuit court to consider on

remand:

> (a) The entry of an order requiring dissolution of the corporation at a specified future date, to become effective only in the event that the stockholders fail to resolve their differences prior to that date;
>
> (b) The appointment of a receiver, not for the purposes of dissolution, but to continue the operation of the corporation for the benefit of all the stockholders, both majority and minority, until differences are resolved or "oppressive" conduct ceases;
>
> (c) The appointment of a "special fiscal agent" to report to the court relating to the continued operation of the corporation, as a protection to its minority stockholders, and the retention of jurisdiction of the case by the court for that purpose;
>
> (d) The retention of jurisdiction of the case by the court for the protection of the minority stockholders without appointment of a receiver or "special fiscal agent";
>
> (e) The ordering of an accounting by the majority in control of the corporation for funds alleged to have been misappropriated;
>
> (f) The issuance of an injunction to prohibit continuing acts of "oppressive" conduct and which may include the reduction of salaries or bonus payments found to be unjustified or excessive;

34

(g) The ordering of affirmative relief by the required declaration of a dividend or a reduction and distribution of capital;

(h) The ordering of affirmative relief by the entry of an order requiring the corporation or a majority of its stockholders to purchase the stock of the minority stockholders at a price to be determined according to a specified formula or at a price determined by the court to be a fair and reasonable price;

(I) The ordering of affirmative relief by the entry of an order permitting minority stockholders to purchase additional stock under conditions specified by the court;

(j) An award of damages to minority stockholders as compensation for any injury suffered by them as the result of "oppressive" conduct by the majority in control of the corporation.

*Edenbaum*, 165 Md. App. at 260-61.

Two overarching principles emerged from *Edenbaum*. *First*, and notwithstanding the title of the statute, dissolution is not the only remedy available to a court that finds oppressive conduct in a dissolution proceeding under CA § 3-413. If a minority shareholder proves that a majority has committed oppressive conduct, as the circuit court found here, the court can fashion remedies anywhere along a broad spectrum that individually or in combination, in its equitable discretion, best redress the minority shareholder's thwarted expectations. *Second*, the terms of the shareholders' agreement define the reasonable expectations of the minority shareholder that the majority can oppress and the boundaries of the remedies the court can award for oppressive conduct. *Edenbaum* recognized that it is possible for a shareholders' agreement to constitute an employment agreement—or, put another way, to

articulate a minority shareholder's expectation to employment on agreed terms—but that the outcome will turn on the specific agreement. 165 Md. App. at 248-50. In general, shareholders' agreements will *not* contain operational terms like that—it is much more common for companies to enter into separate employment agreements with key employees. But closely held corporations like the one in *Edenbaum*, and like Quotient, can and sometimes do manage their affairs more flexibly. The question here is what Quotient and its shareholders actually agreed to, and specifically whether this agreement included any rights to employment Mr. Bontempo could vindicate under the dissolution statute.

The circuit court did not decide this question in its analysis of Count I, so applying the *Edenbaum* principles to this case requires us to interpolate that step now. The circuit court's initial opinion says that Mr. Bontempo had reasonable expectations about his role in the company: that "this *start-up company would employ him*, that he would participate (as a stockholder) in the company's profit distributions and that *he would not be terminated for subjective reasons*." (Emphasis added.) This language seems to have thrown the parties an analytical head-fake—by emphasizing the termination decision in reaching the conclusion that Mr. Lare had behaved oppressively, the opinion could be read to suggest that those expectations included an enforceable right to employment. Had the circuit court found, as in *Edenbaum*, that the shareholders' agreement doubled as an employment agreement, Mr. Bontempo would have a good argument that the circuit court should have made him whole in that regard (or, at the very least, that the court would have abused its discretion by not

36

addressing it).  But unlike *Edenbaum*, the shareholders' agreement in this case makes no mention whatsoever of employment rights.  And the circuit court reached exactly the opposite conclusion in the course of rejecting Quotient's request for a declaratory injunction, when it found that Mr. Bontempo did not have an employment agreement and, therefore, was *an at-will employee*.  As an at-will employee whose shareholders' agreement created no expectations of employment, Mr. Bontempo could not, as a matter of law, have recovered employment-related damages under Count I.  Mr. Lare's frustration of Mr. Bontempo's expectations of employment and participation in the company's management and affairs absolutely informed the broader question of whether his rights as a shareholder were oppressed, and thus whether he was entitled to some form of relief (as we discuss below). But the terms of the agreement itself did not include an enforceable right to employment.

What, then, were Mr. Bontempo's reasonable expectations as a shareholder?  He obviously was entitled to participate fully in Quotient's shareholder distributions, even after his employment was terminated and even after he resigned as an officer and director—which he did, and he does not claim otherwise.  Beyond that, the circuit court's findings support an expectation of continued participation in the affairs and decisions of Quotient consistent with his status *as a shareholder*.  Again, we recognize that the circuit court's initial opinion couched Mr. Bontempo's expectations substantially in terms of employment.  But the final sentence of the circuit court's discussion of Mr. Bontempo's expectations states them in terms more consistent with the agreement's actual scope: "Bontempo stated that his

37

expectations were that he would be an owner of the company, work for the company and would have *a role in the company* as long as he was a stockholder." (Emphasis added.) And because he was (and remains) an owner of the company and did work for the company, the reasonable expectations Mr. Lare thwarted, and for which Mr. Bontempo was entitled to relief, relate to his ongoing role in the company *as a shareholder*.

In that context, we see no abuse of discretion in the court's decision not to dissolve or dismember Quotient. Unlike *Renbaum*, 386 Md. 28, a case involving a family-owned corporation that had an evenly and irreconcilably divided board, the court found that Quotient's board was not so deadlocked, and also that Quotient was a prosperous going concern:

> The Court is of the opinion that [dissolution] would be inappropriate and that less drastic measures are available as remedies to address the harm caused by the oppressive conduct. The court also notes that since Bontempo resigned from the Board of Directors, there is no evidence that the current directors are "so divided" regarding the management of the corporation's affairs that involuntary dissolution of the corporation is warranted. . . . Reinstatement of Bontempo as an employee of Quotient is also not a viable remedy.

> There was also no evidence presented that Quotient is—or is likely to become—insolvent. The company's revenues have continued to increase over the years and O'Leary opined that, in his view, the pending litigation has not had an impact on Quotient's ability to get business.

Dissolution is an extreme remedy, and by acknowledging the availability of alternatives, *Edenbaum* cautions strongly against dissolving corporations when a less drastic remedy will

address the oppressive conduct and resulting harm. 165 Md. App. at 259-61. Quotient grew and paid Mr. Bontempo hundreds of thousands of dollars in distributions during the course of these disputes, even after he ceased to have any role in its business or success (indeed, while he tried to compete with it). A reasonable trial court easily could have decided on this record not to dissolve Quotient, and the circuit court acted well within its discretion in declining to do so here. The same reasoning applies to the court's decision not to divide Quotient's customers between Messrs. Bontempo and Lare, which would have had the same effect as an outright dissolution—the record readily could support a finding that dividing Quotient (or allocating forty-five percent of its customers to Mr. Bontempo's new company) would overpenalize the Lares, overcompensate Mr. Bontempo, needlessly break up a thriving company, or all of the above.

This brings us to the relief the court did order, which focused on the money Mr. Lare misappropriated from Quotient. Initially, the court ordered an accounting in order to determine how much the Lares had diverted. After the accounting was completed (the accounting first identified $118,000 in diverted funds, later amended to $81,818.18), and in response to post-trial motions, the court structured the award as a distribution from Quotient to the shareholders:

> It is the Court's intention to clarify that the Court-ordered accounting is with respect to unreimbursed expenses paid by Quotient for the Lares' household employees or their personal litigation expenses. The Court is also of the opinion that the amount should be characterized as a distribution and that Bontempo should receive his proportionate share.

> The Court's Decision shall be modified as follows:
>
> A full and complete accounting by the Lares (the majority in control of the corporation) for misappropriated funds, *i.e.*, all funds advanced or expenses paid by Quotient for the Lares' household employees or personal litigation expenses; judgment is entered for Bontempo and against Quotient on Count I in a proportionate share of the accounted-for amount.

Mr. Bontempo contends that the trial court abused its discretion by limiting equitable relief to the "proportionate distribution" and argues that this "relief would have been legally required even absent [Mr.] Bontempo's firing."

We disagree, and are persuaded that the court's decisions to award money damages determined by an accounting and to fashion the award as a distribution, in which Mr. Bontempo would share *pro rata* as a shareholder, fell within its discretion. There is nothing unusual about the format of the award—indeed, we specifically included "'[t]he ordering of affirmative relief by the required declaration of a dividend or a reduction and distribution of capital'" among the alternative relief options we adopted in *Edenbaum*. *See* 165 Md. App. at 261 (quoting *Baker*, 507 P.2d at 396). And aside from the timing and rationale of Mr. Bontempo's termination, which we have addressed above, the circuit court found that Mr. Lare acted oppressively in misappropriating funds from Quotient for his and Ms. Lare's personal use. To the extent those misappropriations took money from Quotient that should have been available for distributions to shareholders, Mr. Bontempo is made whole

personally by a distribution that pays him his proportionate share of the misappropriated funds.[20]

And *finally*, and putting aside that the *Edenbaum* list of alternative remedies does not include punitive damages, the record supports the circuit court's findings in the initial opinion that "[a]lthough the Court has found that [Mr.] Lare's conduct was oppressive, the Court does not find that it was fraudulent," and again, after post-trial motions, that "[t]he evidence does not support Bontempo's claim that the Lares engaged in a long course of acts that were illegal or fraudulent."[21] Of course, "minority shareholders are entitled to protection against fraudulent or illegal action of the majority." *Mona v. Mona Elec. Grp., Inc.*, 176 Md. App. 672, 697 (2007). This is particularly true in closely held corporations, in which a "majority shareholder owes a fiduciary duty to the minority shareholder (or shareholders) 'not to exercise [their] control to the disadvantage of minority stockholders.'" *Id.* (quoting *Lerner v. Lerner Corp.*, 132 Md. App. 32, 53 (2000)). And to be sure, a majority shareholder may not use his position of power "for his own benefit or for a purpose adverse to the

---

[20] We will deal below, in connection with the derivative claim in Count III, with the harms Mr. Lare's behavior caused to Quotient as a company and whether the circuit court's relief made *Quotient* whole (sneak preview: it did not).

[21] Mr. Bontempo alleged that the Lares acted illegally when: (1) for tax years 2006 through 2009, Mr. Lare knowingly signed corporate tax returns that mischaracterized certain expenditures made for the Lares' personal use as business expenses; (2) Mr. Lare oversaw the submission of false and misleading financial information to federally-insured financial institutions and to the Internal Revenue Service; and (3) Mr. Lare took bonuses and other compensation without approval of the board. In addition, he alleged that the Lares acted fraudulently by failing to disclose the self-dealing transactions to Mr. Bontempo.

interests of the corporation and its stockholders." *Id.* (citing *Coop. Milk Serv., Inc. v. Hepner*, 198 Md. 104, 114 (1951)).  But we find no clear error in the circuit court's findings that the Lares' specific conduct qualified as oppressive and compensable under *Edenbaum*, rather than illegal or fraudulent.

### 2. The Circuit Court Did Not Err In Granting Summary Judgment For The Lares In Their Personal Capacity.

Mr. Bontempo and the Lares each submitted a motion for summary judgment early in the proceedings, and a hearing on the motions was held on March 3, 2011.  The trial court granted the Lares' motion for partial summary judgment and released them from potential personal liability under CA § 3-413(b)(2), based on the same alleged oppressive, fraudulent, and illegal conduct we addressed above. Mr. Bontempo challenges this decision on appeal and we affirm it.

The Lares moved for summary judgment on two grounds: *first*, that a shareholder cannot be held personally liable for damages under CA § 3-413(b)(2), even with a showing of fraud, and *second*, even if personal liability was possible, that Mr. Bontempo had failed to allege fraud.  In response, Mr. Bontempo contended personal liability was warranted because *Edenbaum* supported personal liability and because he *did* allege fraud:

> Although the Court [in *Edenbaum*, 165 Md. App. 233,] concluded that the majority shareholder in that case would not be held personally liable for back-salary, the Court discussed the fact that in that case there was no allegation of fraud by the majority shareholder, which is relevant to the issue of whether personal liability should attach.  And here Mr. Bontempo's complaint, and the evidence he's cited on the Summary

42

> Judgment Record are replete with allegations that the Lares, as majority shareholders, engaged in fraudulent conduct. . . .

We see no opportunity for personal liability on the part of the Lares here. Remember, again, the purpose of this statute: to vindicate the reasonable expectations of minority shareholders, in their capacities *as shareholders* and as defined by their shareholders' agreement, against oppression by majority shareholders. Here, we have already affirmed the circuit court's finding that the Lares did not act illegally or commit fraud, so Mr. Bontempo's argument here fails at the threshold.

The argument also fails as a matter of law. None of the discussion of personal liability in *Edenbaum* arose in our analysis of the CA § 3-413 claims, but rather in connection with the plaintiff's breach of employment agreement claim. To the extent we suggested that personal liability might be available if the plaintiff proved fraud, we made that suggestion in an altogether different context that does not generalize to claims under CA § 3-413. Regardless, CA § 3-413(b)(2) and *Edenbaum* authorize the circuit court to impose any or all of the available equitable remedies, including dissolution, and to direct those remedies to the offending majority shareholders. *See Edenbaum*, 165 Md. App. at 260. The rights a minority shareholder can assert (or a majority shareholder can oppress) under CA § 3-413 arise under a corporate document that defines the parties' rights and obligations *as shareholders*—a relationship each holds primarily with the company and indirectly with each other—and the available suite of remedies re-balances those relationships.

43

This case is a good example. Mr. Bontempo's injuries manifested themselves here in the form of lost shareholder distributions from Quotient—and, had we agreed with him that he had a reasonable shareholders' agreement-based expectation of employment, his remedy would have taken the form of lost salary and benefits owed to him by Quotient. None of this bears, of course, on the altogether separate question of whether the majority shareholders, *i.e.*, the Lares, are liable to Quotient in connection with these allegations—indeed, as we discuss in Section II.C.1, they are, albeit under a different theory. But on the specific claim under CA § 3-413, we agree with the circuit court that the Lares could not have been liable personally to Mr. Bontempo.

**C.     The Damages Awarded Under Count III Did Not Make Quotient Whole**.

In contrast to his shareholder claim against the Lares in Count I, Mr. Bontempo brought the claims alleged in Counts II, III and IV on behalf of *Quotient*.[22] This group of claims sought to enforce the Lares' obligations to the *company*, not Mr. Bontempo's rights vis-à-vis the Lares. This difference matters—not, as we will explain, with regard to the circuit court's liability findings, with which we agree, but with regard to the remedies the circuit court ordered in response to its findings in Mr. Bontempo's favor on Count III. We

_____

[22] In Count II, Mr. Bontempo asked the court, on behalf of Quotient, to impose a constructive trust in Quotient's favor for the money, property, and services the Lares diverted to their personal use. The court declined to impose a constructive trust, but in its Order, the court erroneously noted that it had entered judgment in favor of *Quotient* and against Mr. Bontempo. By denying Quotient's request for a constructive trust, the court actually entered judgment in favor of the Lares and *against Quotient*, but either way, Mr. Bontempo does not appear to appeal from this decision.

find no error in the circuit court's findings that the Lares' actions breached their fiduciary duties to Quotient and that their specific breaches did not rise to the level of fraud, constructive or otherwise. But after the circuit court found for Quotient and against the Lares on Count III, the ensuing relief should have required the Lares, the parties who breached duties, to make *Quotient*, the victim, whole. By combining the remedies for Counts I and III, the circuit court's relief package left this critical purpose unrequited.

### 1. The Lares Breached Duties, But Did Not Remedy The Breach.

We start from the fact (which they do not dispute) that as officers and directors of Quotient, the Lares owed statutory fiduciary duties to the company. *See* CA § 2-405.1(a); *Storetrax.com, Inc. v. Gurland*, 397 Md. 37, 53-54 (2007) (directors of a corporation "[o]ccupy a fiduciary relation to the corporation and its stockholders"); *Wasserman v. Kay*, 197 Md. App. 586, 609 (2011). Mr. Bontempo's allegations that the Lares breached those duties created a dispute (that this count was meant to resolve) about the alignment between the Lares' financial interests and the company's. Had the Lares prevailed, they might be able to argue that their interests and Quotient's were in sync. But once the circuit court found that the Lares breached those duties, and thus that they were liable to Quotient under Count III,[23] the court found by definition that Quotient's interests *diverged* from the Lares' when they diverted company assets to their personal use, the same transactions that the circuit court

---

[23] There does not appear to have been any dispute about whether Mr. Bontempo satisfied the normal demand requirement or whether such a demand would have been futile. *See generally Wasserman*, 197 Md. App. at 610-12.

45

found oppressive for purposes of CA § 3-413(b)(2). A divergence is not *per se* improper, *see Storetrax*, 397 Md. at 53-61, but the circuit court found it improper here, and we agree. The question now is whether the accounting and distribution the circuit court had ordered under Count I also remedied the Lares' breach of the fiduciary duties they owed to Quotient. We conclude that they did not, because the accounting and distribution the court ordered in Count I did not require the Lares to make Quotient whole.

The essence of the breach here was that the Lares diverted corporate funds to their personal use: they took money from Quotient to which they otherwise were not entitled and used that money to pay personal expenses. At the most fundamental level, then, the circuit court should have required the Lares to repay Quotient from their personal funds. And at first, the circuit court did exactly that. At the post-trial motions hearing, however, counsel for *Quotient*—the corporation from whom the Lares misappropriated funds—asked the court to treat the misappropriated funds as a distribution to shareholders, which would forgive the Lares and pay a proportionate share to Mr. Bontempo:

> Whatever that number is that you come with [through the accounting], let's just say $200,000 just for purposes of the discussion, there are several ways you can handle that.
>
> One way is to treat it as a distribution to the Lares and then there would be an offsetting distribution back to Mr. Bontempo. That is the simplest way to deal with it.
>
> If it's going to be—if you're going to ask that that money be repaid to the company, then it's got to be clear that it not go out in full to Mr. Bontempo because that would be sort of a double recovery.

46

> The simplest way, we think, is just treat it as a distribution. They will then deal with it on their taxes. Mr. Bontempo will get his share and he can deal with it on his taxes.

In its post-trial order, the circuit court agreed, concluding "that the amount established [pursuant to the accounting] should be characterized as a distribution [under Count III] and that [Mr.] Bontempo should receive his proportionate share [through the damage award ordered under Count I]."[24]

This remedy rewarded the Lares at the expense (yet again) of Quotient. A distribution may have had some appeal for accounting purposes, and we recognize that Quotient, acting properly through its board, could have decided after a judgment to declare an equivalent distribution. We also agree that Mr. Bontempo was not entitled to recover directly the full amount of the funds the Lares took from Quotient. But by allowing Quotient to distribute the misappropriated funds back to the Lares, the distribution approach absolved the Lares of their obligation to reimburse Quotient and spared the Quotient board the obligation to justify any distribution on the merits. Indeed, the Count III relief left Quotient *worse off*: the order required Quotient to forgive the Lares *in toto*, and it only got to "keep" 55% of the money the Lares diverted—it had to pay the remaining 45% out of pocket to Mr. Bontempo. By failing to require the Lares to make Quotient whole, the remedies ordered for Count III fell

---

[24] Quotient contends that Mr. Bontempo consented to this proposal, but the record reveals that his counsel commented only that "[t]he return of the money in distributions, those are things that would have been appropriate if Mr. Bontempo was still at the company, no doubt about it."

47

"'beyond the fringe of what [we deem] minimally acceptable,'" *Eastside Vend Distribs., Inc. v. Pepsi Bottling Grp. Inc.*, 396 Md. 219, 239 (2006) (quoting *Dehn v. Edgecombe*, 384 Md. 606, 628 (2005)), and we vacate the damages award under Count III and remand for further proceedings not inconsistent with this opinion. On remand, the circuit court should determine the value of the Lares' diversion (the outcome of the accounting may well provide that figure, but we leave it to the court to decide if that is true) and order the Lares to repay that sum to Quotient. What Quotient does or does not do thereafter is its business, although the board would, of course, need to act in a manner consistent with Maryland corporate law, and specifically would need to be able to justify any post-judgment decision to re-distribute recovered funds against the directors' duties to Quotient at the time and under the circumstances of any such decision.

As we look back at it (a luxury we have on appeal), this proposal suffered all along from a fundamental conflict of interest. Mr. Bontempo was the plaintiff, but *Quotient* was the victim whose rights and injuries Mr. Bontempo sought to redress in Count III. In this important regard, Quotient's interests not only diverged from the Lares', but stood in direct conflict: the Lares took *Quotient's* money, not Mr. Bontempo's. The Lares and Quotient nominally recognized their adverse positions by hiring separate counsel, but seem (incorrectly, in our view) to have treated their interests as fully aligned throughout the litigation, and especially so with regard to the Count III remedy proposal, which benefitted the Lares at Quotient's expense. We recognize and do not mean to diminish the value of

48

settlement. But where, as here, the court has found as a matter of fact that the Lares breached fiduciary duties to Quotient, the court should consider any remedies the Lares and Quotient might propose jointly against the backdrop of this inherent conflict. *See Tydings v. Berk Enters.*, 80 Md. App. 634, 639 (1989) ("Representation of a corporation as an entity and the majority of its directors, individually, creates a possible conflict of interest for the attorney, particularly where the corporation's interests are adverse to those of the directors."); *see also* Hanks § 7.21[g], at 276.48 (2012 Supp.) ("[I]n attempting to settle [a derivative suit against a corporate director], the defendant has an interest in reaching the lowest possible settlement while the corporation, represented by the plaintiff, wants the highest possible settlement."); Md. Rule 16-812 Rules of Prof. Conduct, Rule 1.7.

### 2. The Circuit Court Did Not Err In Declining To Find Fraud Or Impose Punitive Damages.

With regard to Count IV, Mr. Bontempo contends that the trial court erred in declining to find that the Lares engaged in constructive fraud, "a breach of legal or equitable duty which, irrespective of the moral guilt of the fraud feasor, the law declares fraudulent because of its tendency to deceive others, to violate public or private confidence, or to injure public interests." *Scheve v. McPherson*, 44 Md. App. 398, 406 (1979) (quoting 37 C.J.S. *Fraud* § 2c (1943) (predecessor to current 37 C.J.S. *Fraud* § 5 (2008))); *see also Crawford v. Mindel*, 57 Md. App. 111, 120-21 (1984). It is true that constructive fraud commonly arises from a breach of a fiduciary duty in the corporate context. *See* Pleading Causes of Action in Maryland, Torts, Paul Mark Sandler 91 (4th ed. 2010) (citing *Crawford*, 57 Md. App. 111).

49

But the two are not equivalent: a director can breach fiduciary duties without committing fraud.[25]   In this case, the circuit court's factual findings, which we are persuaded are not clearly erroneous on this copious record, fall short of finding an intention or tendency to deceive.  The Lares' actions might better be characterized as brazen, since they seem to have made no effort to hide their use of Quotient's funds for their own purposes:

> The Court found—and remains convinced—that the evidence presented does not support an award of punitive damages.  The evidence does not support Bontempo's claim that the Lares engaged in a long course of acts that are illegal or fraudulent.  Bad judgment, such as including household employees on Quotient's payroll, without more does not rise to the level of being fraudulent conduct.
>
> *       *       *
>
> All of the transactions at issue were recorded on the books of the corporation and it is undisputed that Bontempo had access to these books and records.  The Lares' household employees' names were recorded on the payroll records and several of the employees testified that they were aware of this and had never been told to not mention it to Bontempo.  Some of the evidence presented was to the effect that Bontempo was not only aware of some of these improper transactions but had, in fact, given his approval for them.
>
> Based upon the extensive testimony and evidence presented at the trial, the Court found that although Clark Lare's actions were oppressive, they were not fraudulent.  There was nothing new that was presented during the motions argument to convince the Court that the Plaintiff was defrauded.  Bontempo failed to meet his burden of showing, by clear and convincing evidence, that a fraud was perpetuated upon him or Quotient.

---

[25] The inverse seems impossible, but we need not decide that here.

These findings are consistent with the structure of a corporation held as closely as this one, where the universe of shareholders and board members and officers is small and, if people aren't careful, the personal and corporate boundaries can easily be blurred. The circuit court had the opportunity to hear the testimony and review the evidence first-hand, and we see no basis to second-guess the court's finding that the Lares did not commit fraud.

For the same reason, then, the circuit court did not err in declining to award punitive damages. Beyond fraud, "'actual malice must be proven for recovery of punitive damages in an action for fraud,'" *Ellerin v. Fairfax Sav., F.S.B.*, 337 Md. 216, 236 (1995) (quoting *Fairfax Sav., F.S.B. v. Ellerin*, 94 Md. App. 685, 710 (1993)), and actual malice can be "evidenced by malicious, deliberate, gross or wanton conduct [accompanying] the fraud," *Crawford*, 57 Md. App. at 126, or a showing of an "'evil motive, intent to injure, ill will, or fraud.'" *Garcia v. Foulger Pratt Dev., Inc.*, 155 Md. App. 634, 684-85 (2003) (quoting *Owens-Illinois, Inc. v. Zenobia*, 325 Md. 420, 454 (1992)). Constructive fraud, on its own, would not serve as an independent ground for finding actual malice and would not have been sufficient to sustain a punitive damages award, *Ellerin*, 337 Md. at 236 (constructive fraud "falls short of the act of deliberate deception required for actual malice in this context, and is not sufficient to sustain a punitive damages award"), even if Mr. Bontempo had succeeded in proving some form of fraud, which he didn't. Mr. Bontempo contends that the circuit court should have inferred a wrongful motive from its finding that Mr. Lare used Quotient funds to meet personal financial obligations, that he breached his fiduciary duties to Quotient,

51

and that he failed to disclose his improper conduct to Mr. Bontempo.  But this argument conflates wrongful acts and wrongful motives.  The fact that the Lares breached fiduciary duties does not compel the conclusion that they did so maliciously.  Moreover, a trial court sitting without a jury "has discretion to deny punitive damages even where the record otherwise would support their award."  *Adams v. Coates*, 331 Md. 1, 15 (1993) (citing *Nast v. Lockett*, 312 Md. 343, 349 (1988), *overruled on other grounds*, *Zenobia*, 325 Md. 420); *see also* Maryland Civil Pattern Jury Instructions 10:13 (2009).  Even if we were to assume that the fiduciary breaches could support a punitive damages award (and we make no such finding), the circuit court did not abuse its discretion by declining to make an award on this record.

### 3. On Remand, The Circuit Court Must Reconsider The Attorneys' Fees Award.

Our decision to vacate and remand the damages award relating to Count III requires the same direction with regard to the circuit court's order that Quotient reimburse Mr. Bontempo, the derivative plaintiff, for the attorneys' fees, costs, and expenses he incurred in litigating that count, a total of $109,012.76.[26]  Quotient contends on appeal that the circuit court erred as a matter of law by awarding attorneys' fees to Mr. Bontempo under Count III because, it claims, there was no "common fund."  That might have been true under the original award, since Quotient would not have recovered the money the Lares diverted.  But

___

[26] The trial court initially awarded attorneys' fees under both Counts I and III, but the award for Count I was later vacated by the court upon a finding that there was no legal basis for fee-shifting under that Count.  This ruling was not appealed.

because we now have directed the circuit court on remand to require the Lares to repay

Quotient, Quotient will recover a common fund and an award of attorneys' fees and expenses

would be appropriate under the common fund doctrine.

Maryland courts follow the "American Rule" for granting attorneys' fees. *Garcia*,

155 Md. App. at 660; *see also Hess Constr. Co. v. Bd. of Educ.*, 341 Md. 155, 159 (1996).

Under the American Rule, "in the absence of a statute, rule or contract expressly allowing

recovery of attorneys' fees, a prevailing party in a lawsuit may not ordinarily recover

attorneys' fees." *Baush & Lomb Inc. v. Utica Mut. Ins. Co.*, 355 Md. 566, 590-91 (1999).

However, the "common fund doctrine" is one of the few exceptions to the American Rule.

*See Garcia*, 155 Md. App. at 661-63. As applied and described by the Supreme Court of the

United States in *Boeing Co. v. Van Gemert*, 444 U.S. 472 (1980), the common fund doctrine

recognizes that plaintiffs who file suit and recover on behalf of others will have benefitted

a group or class that has not contributed to the effort:

> [A] litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee *from the fund as a whole*. The common-fund doctrine reflects the traditional practice in courts of equity, and it stands as a well-recognized exception to the general principle that requires every litigant to bear his own attorney's fees. *The doctrine rests on the perception that persons who obtain the benefit of a lawsuit without contributing to its costs are unjustly enriched at the successful litigant's expense.* Jurisdiction over the fund involved in the litigation allows a court to prevent this inequity by assessing attorney's fees against the entire fund, thus spreading fees proportionately among those benefited by the suit.

*Id.* at 478 (emphasis added) (internal citations omitted).  Maryland courts have applied the

doctrine when a plaintiff has prevailed in a lawsuit on behalf of a class that benefits a group

of others in the same manner as himself.  And although "it is infrequently invoked," *Garcia*,

155 Md. App. at 663, the doctrine has applied "where a stockholder's derivative action

benefitted all of the shareholders." *Hess*, 341 Md. at 168 (citing *Davis v. Gemmell*, 73 Md.

530 (1891)).

The application of the common fund doctrine in an individual case lies "within the

discretion of the trial judge," *Garcia*, 155 Md. App. at 662, but whether a prevailing party

is *actually entitled* to fees under the doctrine is, as a pure conclusion of law, an issue we

review for legal correctness. *Id.* at 667.  We accord no deference to the trial court's decision

as to whether the doctrine actually applies. *See Oliver v. Hays*, 121 Md. App. 292, 306

(1998); *see also Garcia*, 155 Md. App. at 667 (applying a two-prong approach, first

determining, as a matter of law, whether the common-fund doctrine applied, then, as a matter

of fact, reviewing whether the doctrine was applied correctly).

Quotient argues on appeal that the trial court erred in awarding attorneys' fees to Mr.

Bontempo under Count III pursuant to the common-fund doctrine for two reasons: (1) the

trial court did not order that the Lares pay monetary damages to Quotient under Count III,

and (2) Quotient was ordered to reimburse Mr. Bontempo for legal fees and expert witness

costs from funds outside of any supposed "common fund." To be sure, there must be a

recovered "fund" from which the fee award can be derived. *Boeing*, 444 U.S. at 478 ("[A]

litigant . . . *who recovers a common fund* for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee *from the fund as a whole*." (Emphasis added.)). And although the circuit court's original handling of damages under Count III may have left some question in this regard, our decision above requires the circuit court to revisit the damages award and, more specifically, to define the common fund that Mr. Bontempo will have recovered on behalf of Quotient. At that point, the court should determine anew, and against the backdrop of that common fund and this opinion, whether and to what extent to award attorneys' fees and costs.

### D. Count V: Mr. Bontempo's Equal Compensation Claim

*Finally*, in Count V, Mr. Bontempo alleged that the Lares had breached two separate agreements between them and him: *first*, an oral agreement under which Quotient would pay him a salary equivalent to the Lares' combined salary; and *second*, an agreement providing that Quotient would pay him shareholder distributions proportionate to his ownership interest. The second of these is not in dispute, and the trial court granted Mr. Bontempo a monetary award of $81,818.18 for unpaid distributions. The court declined, however, to find that an oral equal-compensation agreement existed, and denied any relief for unpaid salaries.

A contract can be formed orally or in writing. *See Cnty. Comm'rs v. J. Roland Dashiell & Sons, Inc.*, 358 Md. 83, 94 (2000) (quoting *Black's Law Dictionary* 323 (6th ed.1990)). "[T]he existence and terms of an oral contract, when disputed, are for the trier of facts to determine," *Globe Home Improvement Co. v. McCarty*, 204 Md. 513, 517 (1954),

and we will not overturn those findings unless they are clearly erroneous. *Eisenberg v. Air Conditioning, Inc.*, 225 Md. 324, 331 (1961). Mr. Bontempo bore the burden of establishing the contract's existence. *See Corry v. O'Neill*, 105 Md. App. 112, 125 (1995); *see also Boyle v. Steiman*, 631 A.2d 1025, 1033 (Pa. Super. Ct. 1993) ("The burden of proving an oral contract is on the party seeking to establish it.").

At trial, Mr. Bontempo and his wife testified that the equal compensation agreement had been formed, and Mr. Bontempo testified about conduct by Mr. Lare that, in his view, proved it, most notably the fact that he was paid a salary equal to the Lares' from 2004 through 2008, through multiple salary changes. The trial court acknowledged this evidence, but also recognized the multiple years in the beginning and toward the end where their salaries differed significantly. Mr. Bontempo argues that at trial he "offered cogent explanations for the periods in which compensation was not equal," but the court nevertheless found that he failed to meet his burden of proving that there was an equal-salary agreement, and reasoned that "[t]here was no evidence of a meeting of the minds on this issue, which is a prerequisite to contract formation."

On appeal, Mr. Bontempo contends that the trial court failed to give appropriate weight to the parties' credibility and to the equalized salary from April 2004 through February 2008. But it is the trial judge's role in a bench trial to determine whether the weight of the credible evidence presented was *sufficient* to support the existence of the equal-compensation agreement, and, here, the trial judge was not persuaded. As we explained

56

above, we review this finding for clear error, and "'[i]f any competent material evidence exists in support of the trial court's factual findings, those findings cannot be held to be clearly erroneous.'" *Collins/Snoops Assocs., Inc. v. CJF, LLC*, 190 Md. App. 146, 160 (2010) (quoting *Figgins v. Cochrane*, 403 Md. 392, 409 (2008)). This is particularly true when the trial judge is *not* persuaded of something:

> "Although it is not uncommon for a fact-finding judge to be clearly erroneous when he [or she] is affirmatively **PERSUADED** of something, it is, as in this case, almost impossible for a judge to be clearly erroneous when he [or she] is simply **NOT PERSUADED** of something."

*Omayaka v. Omayaka*, 417 Md. 643, 658-59 (2011) (quoting *Bricker v. Warch*, 152 Md. App. 119, 137 (2003)). In addition, the record contains competent material evidence to support the trial court's factual finding that no equal-compensation agreement existed, particularly the unequal compensation in the early days of Quotient and toward the end of Mr. Bontempo's tenure there. We find no error, let alone clear error.

**JUDGMENT OF THE CIRCUIT COURT FOR HOWARD COUNTY AFFIRMED IN PART, VACATED IN PART AND REMANDED FOR FURTHER PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION. COSTS TO BE DIVIDED EQUALLY BETWEEN THE PARTIES.**