ADKINS, J.,
which HARRELL, J., joins.
“In all situations and under all circumstances, whether new or old, the principles of equity will point the way to justice where legal remedies are infirm.” Joseph Story, 1 Commentaries on Equity Jurisprudence as Administered in England and America § 4, at 5 (14th ed. 1918). Respectfully, I dissent because I think the Chancellor erred in failing to exercise her discretion in fashioning available equitable relief to remedy the oppression by the majority shareholders. The Chancellor erred in deducing there was “no legal basis” for Bontempo’s claim that he is entitled to employment-based damages. Equally important, the Chancellor limited relief to a money judgement for past defalcations of a 55% shareholder, plus attorneys’ fees, without considering how to provide any protection going forward. Bontempo requested various equitable remedies that would offer him protection against Respondents’ continuing to funnel corporate earnings to their personal benefit. Although finding oppression, and defeat of Bontempo’s reasonable expectations as a shareholder and employee, her memorandum opinions suggest she did not fully consider the alternative equitable remedies. I would vacate and remand for consideration of these equitable remedies, including damages for lost employment.
FACTS
In 1999, husband and wife Clark and Jodi Lare formed Quotient, Inc. (“Quotient”), an information technology services company focused on fulfilling government and private contracts. In an effort to gain favor in obtaining government contracts as a majority female-owned company, Clark Lare owned a 49% share of the company, and Jodi owned the remaining 51% of the shares. While Quotient was still in its infancy, Clark Lare invited his former coworker, David Bon *381 tempo, to join the firm as a minority shareholder and employee. Pursuant to the amended shareholders’ agreement, executed in 2000, Bontempo owned 45% of the company, Clark Lare owned 4%, and Jodi Lare retained her 51% interest. They never reduced an employment agreement to writing.
Over the years, Quotient grew, eventually obtaining a General Services Administration schedule.[1] As a result of Quotient’s success,[2] the three owners enjoyed larger salaries and corporate perks, including having Quotient pay for cell phone and credit card expenses, automobiles, and personal physical trainers.
But the Lares went further in their use of corporate assets for personal use, brazenly treating Quotient funds as if they resided in their own personal bank accounts.[3] Beginning in 2006, they used corporate funds to pay household employees and personal legal fees. The household employee expenses were disguised in Quotient’s books and on its financial statements as “general and administrative expenses.” Bontempo testified that notwithstanding his position as a 45% sharehold *382 er, Lare never asked Bontempo for permission to use Quotient funds for these expenses.[4]
The Lares also advanced loans to themselves[5] — some of them interest-free loans to separate companies they owned and in which Quotient had no ownership interest. The Expert Witness Report prepared by a forensic accountant hired by Bontempo during this litigation found that between 2001 and May 2010, Quotient loaned approximately $1,204,000 to these companies on an unsecured basis.[6] Bontempo testified that there was no legitimate business purpose for any of these loans. He also testified that Lare never asked for his permission to make these loans.
Not only did the Lares use Quotients funds for personal expenses without Bontempo’s knowledge or authorization, but also these transactions rarely, if ever, appeared on Quotient’s financial statements. What is more, despite significant sums being diverted to these personal uses, Lare rejected Bontempo’s request that they hire a new business development em *383 ployee, “claiming that Quotient did not have the funds” to do so.
Bontempo and Lare’s relationship first began to crumble in 2007, when — Bontempo alleged — Clark Lare took a $100,000 distribution and asked Bontempo to wait until the end of the year to take his own distribution. But when Lare converted his distribution to a loan, Quotient was no longer compelled to make an equivalent distribution to Bontempo. Bontempo alleged similar behavior in 2008 and 2009, and also a salary imbalance[7] between the two men. Conversely, Lare blamed Bontempo’s poor job performance for the strained relationship and asserted he reduced Bontempo’s salary in an effort to motivate him.
At a meeting in November 2009, Lare raised the issue of Bontempo’s performance. In January 2010, the two met again — this time to discuss their salaries and distributions. At this meeting, Bontempo suggested they create an exit strategy, proposing that they split the company. Lare refused and informed Bontempo that he should sell his stock back.
In March 2010, after Lare provided Bontempo with a separation agreement that Bontempo refused to sign, Lare informed Bontempo that he was being terminated. At this time, Bontempo received no indication that his termination was for cause. At trial, Lare contended that the termination was a result of poor job performance.
Litigation
Bontempo filed a Complaint in the Circuit Court for Howard County seeking relief pursuant to Maryland Code (1975, 2007 Repl. Vol.), §§ 3-413 and 3-414 of the Corporations and Associations Article (“CA”), which provide for involuntary dissolution and the appointment of a receiver, respectively. In response, Quotient and the Lares filed a counterclaim, seeking a declaratory judgment that Quotient terminated Bontempo *384 for good cause and that Bontempo must resell his stock to Quotient, and seeking to hold Bontempo liable for breaching his fiduciary duties to Quotient. Bontempo filed two amended complaints that alleged new counts, and Quotient and the Lares responded with counterclaims.[8] Bontempo brought suit both personally and derivatively on behalf of Quotient, naming the Lares and Quotient as defendants. On cross-motions for summary judgment, the Circuit Court dismissed Bontempo’s request for employment-based remedies from the Lares personally.
The Chancellor held a nine-day bench trial, resulting in three memorandum opinions and four orders. In its first opinion, entered September 29, 2011, the court found that “[tjhere was substantial and credible evidence ... establishing that Bontempo joined Quotient ... with the express intention of playing a substantial part in the company’s growth and financial success.” In spite of Bontempo being a “responsible and dedicated employee,” he was terminated without cause. The trial court opined:
Lare’s actions were oppressive, particularly as they related to the credible testimony that Bontempo would be fired if he did not voluntarily resign and sell his shares of Quotient stock. Bontempo’s reasonable expectations were that this start-up company would employ him, that he would participate (as a stockholder) in the company’s profit distributions and that he would not be terminated for subjective reasons.
The court found “Bontempo’s expectations to be objectively reasonable,” including “that he would be an owner of the company, work for the company and would have a role in the company as long as he was a stockholder.” The court also concluded that Lare’s actions were oppressive because *385 “[t]here [was] no support for Lare’s position that Bontempo was well aware of — and approved — the multitude of transactions” in which Lare misused corporate funds for his personal benefit.
Ruling that dissolution was too drastic a remedy, the Chancellor considered the equitable remedies “available to it under Edenbaum, [v. Schwarcz-Osztreicheme, 165 Md.App. 233, 885 A.2d 365 (2005) ].” It ordered an accounting of all misappropriated funds and reimbursement of legal and expert witness fees incurred by Bontempo.[9] But despite finding Lare’s conduct regarding Bontempo’s “reasonable expectations ... that he would not be terminated for subjective reasons” oppressive, the trial court failed to address how Bontempo’s loss of employment should be remedied.
Following the Chancellor’s initial decision, the parties filed cross-motions to alter or amend the judgment. In his motion, Bontempo urged the court to grant additional relief, arguing that the original decision did not grant sufficient relief to protect his interests. He asked the court to grant various forms of broad equitable relief.[10] Bontempo contended that *386 “none of the items of monetary relief awarded by the [Circuit] Court address[ed] his objectively reasonable expectation that he would remain employed as a 45% owner, director, officer and employee of Quotient.”
Regarding Bontempo’s request for damages from lost salary arising out of his termination, the court reasoned:
The court found that Bontempo was an at-will employee, and as such, could be terminated at any time for any reason. In spite of those findings, Bontempo requests that the Court award him back-pay since March 26, 2010 in the annual amount of $225,000. The Court finds that no legal basis exists for Bontempo’s claim that he is entitled to employment-based damages for the Lares’ breaches of their fiduciary duties.
There is no dispute that Bontempo received salary, bonus and distribution income from Quotient for a significant period of time. Although he had reasonable expectations when he took the risk to join Quotient more than ten (10) years ago, it was with the knowledge that he was a minority stockholder and an at-will employee. It would be unreasonable to assume that his expectancy interests included lifetime employment with the company. Although he was terminated and the Court found that Clark Lare’s actions were oppressive, the facts do not support *387 Bontempo’s receipt of salary and bonus monies after the cessation of his employment with Quotient.
(Emphasis added.) To further bolster its conclusion that the equitable remedies provided would redress Bontempo’s injury, the Circuit Court highlighted that Bontempo “continues to receive his share of stockholder distributions, none of which have ever been withheld. As long as the company remains viable and profitable, Bontempo will continue to receive distributions by virtue of being a stockholder.” In light of the past actions of the Lares, the reliability of this assumption by the Chancellor going forward is questionable.
Equitable Relief For Shareholder-Employee Under CA § 3-413
CA § 3^113 permits a court to consider other remedies short of dissolution when crafting equitable relief to rectify a majority shareholder’s oppressive conduct in a close corporation. Edenbaum, 165 Md.App. at 261, 885 A.2d at 380. In Edenbaum, the Court of Special Appeals applied the reasonable expectations view of oppressive conduct. Id. at 259, 885 A.2d at 379. Relying on the reasoning of the Court of Appeals of New York, our intermediate appellate court stated that “oppression should be deemed to arise only when the majority conduct substantially defeats expectations that, objectively viewed, were both reasonable under the circumstances and were central to the petitioner’s decision to join the venture.” Id. at 258, 885 A.2d at 379 (quoting Matter of Kemp & Beatley, Inc., 64 N.Y.2d 63, 73, 484 N.Y.S.2d 799, 473 N.E.2d 1173, 1179 (1984)) (internal quotation marks omitted). The Court of Special Appeals also relied on Balvik v. Sylvester, a case from the Supreme Court of North Dakota, for the proposition that “a minority shareholder who reasonably expects that ownership in the corporation would entitle him to a job, a share of the corporate earnings, and a place in corporate management would be ‘oppressed’ in a very real sense ... when the majority seeks to defeat those expectations and there exists no effective means of salvaging the investment.” Id. (quoting Balvik v. Sylvester, 411 N.W.2d 383, 387 (N.D. *388 1987)) (internal quotation marks omitted). I agree with the guidance offered by our sister states and embraced by the Court of Special Appeals.
The Lares do not dispute at this juncture of this litigation that there was oppression. The Chancellor found that
Lare’s actions were oppressive, particularly as they related to the credible testimony that Bontempo would be fired if he did not voluntarily resign and sell his shares of Quotient stock. Bontempo’s reasonable expectations were that this start-up company would employ him, that he would participate (as a stockholder) in the company’s profit distributions and that he would not be terminated for subjective reasons. Bontempo was more than a mere employee of Quotient — he was, in all respects, a founding member of the company and made significant contributions to the company’s later successes.
Although the Circuit Court found that “Bontempo’s reasonable expectations were that [Quotient] would employ him, that he would participate (as a stockholder) in the company’s profit distributions and that he would not be terminated for subjective reasons,” its judgment provided no relief to Bontempo other than a money judgment for corporate funds misappropriated in the past by the majority shareholders and reimbursement for attorneys’ fees and litigation expenses. When a court makes a finding of oppressive conduct (as was done here), Edenbamn teaches that the proper course of action for a trial judge in formulating appropriate relief (especially where requested to consider such), is to grant equitable relief to correct the wrongs found to have occurred. See Edenbaum, 165 Md.App. at 260, 261, 885 A.2d at 380, 381 (remanding for consideration of equitable remedies when minority shareholder’s employment was terminated, frustrating her reasonable expectations); Balvik, 411 N.W.2d at 388, 389 (remanding for consideration of equitable remedies short of dissolution when minority shareholder’s employment terminated); McCauley v. Tom McCauley & Son, Inc., 104 N.M. 523, 527, 532, 724 P.2d 232, 236, 241 (1986) (affirming equitable remedies granted to minority shareholder who was ousted *389 from membership on board of directors, removed from her office as Secretary-Treasurer, and denied personal benefits authorized for other shareholders); Alaska Plastics, Inc. v. Coppock, 621 P.2d 270, 275, 278 (Alaska 1980) (remanding for consideration of equitable remedies less drastic than dissolution when minority shareholder was allegedly denied benefits accorded to other shareholders).
Here, the Chancellor — sensing some tension between the equitable relief available under CA § 3-413 and the doctrine of at will employment — elected not to test those waters. In doing so, the Chancellor believed that she could not award damages for loss of employment as a matter of law. I submit that this decision was an error of law, even though not necessarily one a conscientious judge could have foreseen. The at-will employment doctrine — a creature of employment law — does not necessarily erase Bontempo’s reasonable expectations as a shareholder that he be employed absent reason to terminate him. The at-will doctrine and reasonable expectations have been seen as distinct areas of law which authorize different sources of relief. The reasoning of the Court of Appeals of Minnesota is instructive on this point:
The doctrine of employment-based shareholder oppression is distinct from the wrongful-termination doctrine, and the analysis under the separate doctrines should attempt to protect close-corporation employment and, at the same time, respect the legitimate sphere of the at-will rule.
The wrongful-termination doctrine affords discharged employees of all corporations a remedy in the form of wages and/or reinstatement, regardless of whether they are also shareholders, if they can establish the existence of an express or an implied contractual agreement or a promise inducing reliance. The threshold question in wrongful-termination cases, therefore, is whether a contractual agreement or a promise inducing reliance existed.
The oppression doctrine, on the other hand, affords closely-held-corporation shareholders relief when the controlling shareholders frustrate their reasonable expectations as shareholder-employees. Accordingly, the *390 threshold question in the context of a claim of shareholder oppression based on the termination of employment is whether a minority shareholder’s expectation of continuing employment is reasonable.
Gunderson v. Alliance of Computer Prof'ls, Inc., 628 N.W.2d 173, 190 (Minn.Ct.App.2001) (emphasis added) (internal citations omitted). The source of Bontempo’s claim lies not in a written or oral contract between Bontempo and Quotient but in the oppression of his reasonable expectations as a shareholder in a close corporation whose primary return on investment was his employment. See Kortum v. Johnson, 755 N.W.2d 432, 440-41 (N.D.2008) (“Even though Kortum was an at-will employee, and therefore could be terminated with or without cause, the termination of her employment triggers an inquiry into whether the Corporation acted in a manner unfairly prejudicial toward Kortum in her capacity as a shareholder-employee.” (citing Gunderson, 628 N.W.2d at 190)); Hayes v. Olmsted & Assocs., 173 Or.App. 259, 266, 21 P.3d 178, 182 (2001) (“The ‘squeeze-out’ tactics of majority shareholders often deprive minority shareholders of management participation, employment income or other advantages that they reasonably have come to expect, and which are the essential benefits of their investment.”); Bonavita v. Corbo, 300 N.J.Super. 179, 197, 692 A.2d 119, 128 (1996) (ordering a buy-out of oppressed shareholder’s stock because “[a] shareholder who reasonably expected that ownership in the corporation would entitle him or her to a job, a share of corporate earnings, a place in corporate management, or some other form of security, would be oppressed in a very real sense when others in the corporation seek to defeat those expectations and there exists no effective means of salvaging the investment.” (quoting In re Kemp & Beatley, Inc., 484 N.Y.S.2d at 805, 473 N.E.2d at 1179)); In re Topper, 107 Misc.2d 25, 433 N.Y.S.2d 359, 365 (1980) (stating that “reasonable expectations constitute the bargain of the parties in light of which subsequent conduct must be appraised,” and protecting shareholder’s employment despite no such guarantee in shareholder agreement and no explicit state statutory protec *391 tion of shareholder employment because “generally, there is an expectation on the part of some participants that their interest is to be recognized in the form of a salary derived from employment with the corporation.” (citation and internal quotation marks omitted)); Wilkes v. Spring side Nursing Home, Inc., 370 Mass. 842, 850, 353 N.E.2d 657, 662-63 (1976) (“[B]y terminating a minority stockholder’s employment or by severing him from a position as an officer or director, the majority effectively frustrate the minority stockholder’s purposes in entering on the corporate venture and also deny him an equal return on his investment.”); 1 F. Hodge O’Neal & Robert B. Thompson, Close Corporations and LLCs: Law and Practice § 6:2, at 6-4 (3d ed. 2014) (“Increasingly, courts have come to recognize that within many closely held enterprises it is not as easy to separate out the employment relationship from the ownership relationship, and have applied the reasonable expectations approach used more generally in close corporations.”).
This reasoning is consistent with our recent holding in Spacesaver Systems, Inc. v. Adam, 440 Md. 1, 98 A.3d 264 (2014).[11] In that case, we recognized continuous for-cause employment security in a close corporation where a shareholder-employee had a for-cause provision in her employment agreement. Id. at 21, 98 A.3d at 276. Because of that written employment agreement, our discussion in that case revolved around contract-based employment security — both written and oral. If we were to adopt the Gunderson analysis, as I advocate, we would still leave wholly intact this reasoning while supplementing it with job security born not of contract but of employment-based oppression of a shareholder’s reasonable expectations.
Based on these authorities, I would hold that the Chancellor erred in concluding that there was “no legal basis” for Bontempo’s claim for damages from his lost employment. I would vacate the Circuit Court’s decision and direct that the case be *392 remanded to that Court for consideration of damages or other relief from the Lares’ defeat of his reasonable expectation of continued employment, based on the Chancellor’s findings that “Bontempo joined Quotient ... with the express intention of playing a substantial part in the company’s growth and financial success” and that he was terminated without cause.[12]
OTHER EQUITABLE RELIEF
The Chancellor’s decree, although awarding him damages for the Lares’ past defalcations, stopped short of protecting Bontempo’s future rights to distribution of profits. “[T]he peculiar duty of a Court of Equity is to supply the defects of the common law, and next, to correct its rigor or injustice.” 1 Commentaries on Equity Jurisprudence § 17, at 17. That Bontempo received distributions during the course of the trial is no surprise. Bontempo, 217 Md.App. at 97, 90 A.3d at 568. But the Chancellor’s decree offers no meaningful protection against continued oppressive conduct on the part of the Lares once this litigation ceases to be a threat.[13] Once this litigation ends, the Lares are free to return to their previous conduct, giving themselves loans and distributions while stripping Bontempo of the financial fruits of his investment. Or, the Lares may seek to disguise corporate earnings by increasing their own salaries unreasonably, thus decreasing the amounts other *393 wise available for shareholder distribution. The facts already found by the Chancellor are highly suggestive that such conduct is more than mere fortune-telling.
The tenuous position of the minority shareholder in a close corporation — such as Bontempo — merits special attention when considering the majority’s oppressive conduct and the frustration of the minority’s reasonable expectations. For this reason, courts often consider all owners in close corporations to have fiduciary duties similar to partnerships. See, e.g., Walta v. Gallegos Law Firm, P.C., 131 N.M. 544, 40 P.3d 449, 456 (Ct.App.2001) (“To combat such tactics, courts have, over the years, recognized various versions of fiduciary duties that majority or controlling shareholders owe to minority shareholders.”); Hayes, 173 Or.App. at 265, 21 P.3d at 181-82 (“As is the case among partners, those in control of the affairs of a closely held corporation have fiduciary duties of good faith, fair dealing, and full disclosure toward minority shareholders.”); James M. Van Vliet Jr. & Mark D. Snider, The Evolving Fiduciary Duty Solution for Shareholders Caught in a Closely Held Corporation Trap, 18 N. Ill. U.L.Rev. 239 (1998) (“Over the years, in a growing number of states where the courts have considered the matter, shareholders in at least certain types of closely held corporations have been held to owe a partner-like fiduciary duty to each other.”). In this way, minority shareholders gain some protection from being the victims of a “squeeze-out,” like Bontempo. See, Balvik, 411 N.W.2d at 387 (“Because of the predicament in which minority shareholders in a close corporation are placed by a ‘freeze out’ situation, courts have analyzed alleged ‘oppressive’ conduct by those in control in terms of ‘fiduciary duties’ owed by the majority shareholders to the minority and the ‘reasonable expectations’ held by the minority shareholders in committing their capital and labor to the particular enterprise.”). The Lares, in complete disregard of their corporate partner, and without notice to him, misappropriated large sums of money from the corporation for their own personal use. This conduct merits relief that not only requires return of the *394 misappropriated money, but guards against future abuse of their majority shareholder power.
We have recognized the maxim that “equity will not suffer a wrong to be without a remedy.” Manning v. Potomac Elec. Power Co., 230 Md. 415, 421, 187 A.2d 468, 472 (1963). In Edenbaum, the Court of Special Appeals adopted from Baker v. Commercial Body Builders, Inc., 264 Or. 614, 632-33, 507 P.2d 387, 395-96 (1973), a list of potential equitable remedies:
(a) The entry of an order requiring dissolution of the corporation at a specified future date, to become effective only in the event that the stockholders fail to resolve their differences prior to that date;
(b) The appointment of a receiver, not for the purposes of dissolution, but to continue the operation of the corporation for the benefit of all the stockholders, both majority and minority, until differences are resolved or “oppressive” conduct ceases;
(c) The appointment of a “special fiscal agent” to report to the court relating to the continued operation of the corporation, as a protection to its minority stockholders, and the retention of jurisdiction of the case by the court for that purpose;
(d) The retention of jurisdiction of the case by the court for the protection of the minority stockholders without appointment of a receiver or “special fiscal agent”;
(e) The ordering of an accounting by the majority in control of the corporation for funds alleged to have been misappropriated;
(f) The issuance of an injunction to prohibit continuing acts of “oppressive” conduct and which may include the reduction of salaries or bonus payments found to be unjustified or excessive;
(g) The ordering of affirmative relief by the required declaration of a dividend or a reduction and distribution of capital;
*395 (h) The ordering of affirmative relief by the entry of an order requiring the corporation or a majority of its stockholders to purchase the stock of the minority stockholders at a price to be determined according to a specified formula or at a price determined by the court to be a fair and reasonable price;
(i) The ordering of affirmative relief by the entry of an order permitting minority stockholders to purchase additional stock under conditions specified by the court;
(j) An award of damages to minority stockholders as compensation for any injury suffered by them as the result of “oppressive” conduct by the majority in control of the corporation.
165 Md.App. at 260-61, 885 A.2d at 380-81 (emphasis added). The equitable relief highlighted above in bolded script provides many alternatives the Chancellor could have considered, but did not. Bontempo asked for appointment of receivers, entry of an order reinstating him, dissolution, an injunction, an order permitting him to purchase additional stock, damages, and attorney’s fees. Instead, the Circuit Court seemed to focus primarily on the employment-based relief requested by Bontempo, which it erroneously rejected as a matter of law, or alternatively, dissolution.
In its second memorandum opinion, the Circuit Court responded to cross-motions to alter or amend its previous judgment. Bontempo asserted that the court’s initial ruling did not grant sufficient relief pursuant to Edenbaum.[14] Specifically, Bontempo sought the following relief:
[a] Appoint an agent to supervise, and to report to the Court, concerning a Court-ordered allocation of Quotient’s accounts and other assets on a 55/45 basis, with the Court retaining equitable jurisdiction to grant further relief at a later date or, alternatively direct the Lares to sell their stock to Bontempo under the provi *396 sions of the Amended and Restated Stockholders Agreement (ARSA).[15]
[b] Establish accounting procedures.
[c] Allocate certain [Quotient] contracts to Bontempo as a subcontractor to Quotient.
[d] Award Bontempo the salary he has not received since March 2010, in an amount equal to the combined salaries of Clark Lare and Jodi Lare.
[e] Award Bontempo additional attorney’s fees and litigation expenses.
[¶] Make a finding of fraud and award Bontempo punitive damages.
[g] Require Jodi Lare (majority shareholder) to terminate Clark Lare (minority shareholder) for cause.
[h] Impose personal liability on Clark Lare and Jodi Lare for the damages the Court awarded to Bontempo under Count I of the Second Amended Complaint.
[i] Imposition of a constructive trust.
[j] Make a finding of constructive fraud.
[k] Award other various forms of short term relief.
In addition to the ten equitable remedies advanced by Edenbaum (only three of which were expressly addressed by the Circuit Court in its May 8 memorandum opinion), there are a number of other equitable remedies a court could consider in the context of shareholder oppression:[16]
*397 • Cancelling or altering any provision of the articles of incorporation or the bylaws.
• Cancelling, altering or enjoining any resolution or other act of the corporation.
• Directing or prohibiting any act of the corporation or of the shareholders, directors, officers or other persons party to the action.
• Providing for the sale of all the property and franchises of the corporation to a single purchaser.
• Ordering access to corporate records.
• Defining as constructive dividends any amount paid by the corporation to the controlling shareholders above a “reasonable salary” and ordering the corporation to pay a shareholder discharged without cause an amount per share equal to the constructive dividend.
• Ordering issued stock to be cancelled or redeemed in order to achieve a 50/50 balance or some other ownership structure fair to the shareholders.
• Rescinding a particular corporate act that is unfair to the minority.
• Awarding punitive damages.
• Removing the majority shareholders and putting day to day operation in the hands of employees.
• Awarding plaintiff the value, as nearly as possible, of the plaintiffs rights under the management agreement by giving plaintiff her share of retained earnings, the sum total of profits made since the inception of the company.
• Appointing provisional directors.
In Bonavita, supra, the New Jersey Superior Court offered a thorough discussion of the alternative remedies in a case involving two 50% shareholders, one of whom was the widow of a former employee of the corporation. The court held that *398 the other 50% shareholder — the company president, who, along with his children, was employed by the corporation— oppressed the widow. Bonavita, 300 N.J.Super. at 197, 692 A.2d at 128. After thoroughly considering the options, the Chancery Court ordered a buy-out via the use of a special fiscal agent:
The order to be entered at this time will direct that the corporation buy the stock. However, Brenner v. Berkowitz indicated that in an appropriate case, where there is a need to do so, a court may order that the purchase be made by another shareholder. So here, while a purchase by the corporation is preferable and will be the first option, it is possible that a purchase by Alan Corbo may require consideration. That too cannot now be resolved.
To investigate and consider all of these issues, and any others that must be resolved in order to effect the purchase of the Bonavita stock, this court will appoint a special fiscal agent. The agent will consult with the attorneys for the parties; make such independent investigation as may be deemed necessary or appropriate; and may consult with banks, other possible lending sources, accountants, and anyone else deemed helpful. The agent will then submit a proposal as to the terms and conditions on which the sale will take place. The parties will have an opportunity to be heard concerning the agent’s report, and thereafter, the court will enter a final order fixing the terms and conditions of sale.
Id. at 201, 692 A.2d at 130 (emphasis added).
Many of the above forms of equitable relief — either in isolation or operating in tandem — could offer Bontempo meaningful relief such that his objectively reasonable expectations would be met. Not only would they rectify the oppressive conduct that forced Bontempo out of his job, but also these remedies could guard against continued oppressive conduct on the part of the Lares vis-a-vis shareholder distributions. I would remand with instructions that the Chancellor consider these remedies against continued oppressive conduct. Although none of these equitable remedies must be granted, the *399 Chancellor should consider them free from the strictures of at-will employment she imposed upon herself.
Judge HARRELL has authorized me to state that he joins in the views expressed in this dissenting opinion.

. The United States General Services Administration "establishes long-term government wide contracts with commercial firms to provide access to millions of commercial products and services at volume discount pricing.” GSA Schedules, http://www.gsa.gov/portaI/contenV 197989 (last visited July 16, 2015).

. Quotient secured lucrative contracts with a number of large public and private entities, including: "the United States Census Bureau, Lockheed Martin Corporation, the Internal Revenue Service, the United States Patent and Trademark Office, the Maryland Department of Education, the Smithsonian Institution, the National Library of Medicine and the Clinical Center (each a division of the National Institutes of Health), AARP, the United States Department of Homeland Security, the University of Maryland Medical Systems, and TAJ Technologies, Inc.” Bontempo v. Lare, 217 Md.App. 81, 94 n. 6, 90 A.3d 559, 566 n. 6 (2014).

. "Although Ms. Lare was Quotient's majority shareholder, she had little to no role in Quotient’s business. When the circuit court used the term 'Lare' in the singular, it referred to Mr. Lare.” Id. at 93 n. 5, 90 A.3d at 566 n. 5. Henceforth, for this reason, "Lare” shall refer to Clark Lare.

. A forensic accountant hired by Bontempo reported that Lare also used Quotient funds to pay for the following personal expenses:
• $67,000 for antiques
• $75,000 for home remodeling
• $3,599 for fitness equipment

. In December 2007, Lare placed a strain on Quotient's liquidity when he borrowed $205,586 from Quotient to pay expenses related to a home remodel and difficulties the Lares were having with the contractors they hired. Although the note was to be paid in full by March 2009, Lare instead executed another note in February 2009 in the amount of $497,267, with the balance due in January 2016. Lare's year-end loan balances between 2006 and 2009 were as high as $556,564, and Bontempo testified that the Lares borrowed "well in excess of a [mjillion dollars” from Quotient. Although Bontempo authorized at least one of the loans to Lare, he testified that Lare ignored the terms of the promissory note. Bontempo also testified that Lare "had the habit of taking money out of the company” and "all of the sudden” deciding to "just create a loan for it.”

. The forensic accountant also identified a number of disbursements from Quotient to a separate company in which Jodi Lare owned a 60% interest that appeared to have no business purpose but were nevertheless charged to Quotient expense accounts.

. Bontempo asserted — and the Circuit Court rejected — that the parties orally agreed that he would draw a salary equal to the combined salaries of Clark and Jodi Lare.

. In his First Amended Complaint, Bontempo added claims for constructive trust, breach of fiduciary duty, and constructive fraud. In his Second Amended Complaint, he added a claim for breach of contract. Thus, his Second Amended Complaint — the operative complaint in this litigation — contained five counts: Involuntary Dissolution (Count I); Constructive Trust (Count II); Breach of Fiduciary Duty (Count III); Constructive Fraud (Count IV); and Breach of Contract (Count V).

. Additionally, in its first memorandum opinion, the Circuit Court declined to order a constructive trust and ruled in favor of Bontempo— on behalf of Quotient — on the breach of fiduciary duty claim but not on his constructive fraud claim. It ruled against Bontempo in his claim seeking damages for the unequal salaries between him and the Lares but awarded him damages for the distributions to which he was entitled. Lastly, the court denied Quotient’s request for a declaratory judgment that Bontempo was fired for cause and its claim against Bontempo for breach of fiduciary duty.

. These were as follows:
[a] Appoint an agent to supervise, and to report to the Court, concerning a Court-ordered allocation of Quotient’s accounts and other assets on a 55/45 basis, with the Court retaining equitable jurisdiction to grant further relief at a later date or, alternatively direct the Lares to sell their stock to Bontempo under the provisions of the Amended and Restated Stockholders Agreement____
[b] Establish accounting procedures.
[c] Allocate certain Quotient ... contracts to Bontempo as a subcontractor to Quotient.
*386 [d] Award Bontempo the salary he has not received since March 2010, in an amount equal to the combined salaries of Clark Lare and Jodi Lare.
[e] Award Bontempo additional attorneys' fees and litigation expenses.
[¶] Make a finding of fraud and award Bontempo punitive damages.
[g] Require Jodi Lare (majority shareholder) to terminate Clark Lare (minority shareholder) for cause.
[h] Impose personal liability on Clark Lare and Jodi Lare for the damages the Court awarded to Bontempo under Count I of the Second Amended Complaint.
[i] Impos[e] a constructive trust.
[j] Make a finding of constructive fraud.
[k] Award other various forms of short term relief.

. We had not decided SpaceSaver when the Chancellor made her decision in this case.

. I take issue with the Majority’s statement that Bontempo "asks that the court enhance the return he receives from his ownership interest by awarding pay-related damages that multiply the monetary award many fold without need for him to have performed any work.” Maj. Op. at 373, 119 A.3d at 808. Of course, wrongfully discharged employees "have a legal obligation to use reasonable diligence in finding other suitable employment and thereby mitigating their damages.” Stanley Mazaroff, Maryland Employment Law § 5.01 [8], at 333 (2d ed. 2001). Thus, Quotient would be entitled to "setoff from the wages and benefits that [Bontempo] lost by reason of the wrongful discharge in the amount of any wages and benefits actually earned following termination, as well as any compensation that [Bontempo] could earn by the exercise of reasonable diligence.” Id. at 333-34.

. The threat of possibly having to pay Bontempo’s legal fees is not much protection, considering the sizable profits earned by this small company.

. In each of the three iterations of his complaint, Bontempo had also explicitly referred to Edenbaum — along with CA §§ 3-413 and 3-414— as a source of relief.

. The Circuit Court rejected this form of relief, stating that "[t]he corporation is not on the brink of insolvency and, in fact, has managed to prosper financially while dealing with this litigation and the strife it has caused all the employees during its pendency.” Quotient’s financial health has nothing to do with Bontempo’s request for an agent to protect his ownership interest from Lare’s oppressive actions. Failure to consider whether an agent was necessary to protect Bontempo from oppression was error.

. 2 F. Hodge O’Neal & Robert B. Thompson, Oppression of Minority Shareholders and LLC Members § 7:24, at 7-200-7-201 (2nd ed. 2014); *397 2 F. Hodge O'Neal & Robert B. Thompson, Close Corporations and LLCs: Law and Practice § 9:41, at 9-277, 9-278 (3d ed. 2014).